COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

LAKE FOREST, INC., Respondent.

No. 8542.

United States Court of Appeals
Fourth Circuit.

Argued April 2, 1962.

Decided June 26, 1962.

Fred E. Youngman, Attorney, Department of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Melva M. Graney, Attorneys, Department of Justice, on brief), for petitioner.

Wallace C. Murchison, Wilmington, N. C. (Carter, Murchison, Fox & Newton, Wilmington, N. C., on brief), for respondent.

Before SOPER, BOREMAN and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

"Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare" are exempt from Federal income taxes.[1] Lake Forest, Inc., the Tax Court held, is such an organization. Thus defeated in his claim for taxes in the years 1948 to 1956, the Commissioner of Inter-

1. Internal Revenue Code of 1939:
"§ 101. Exemptions from tax on corporations
" * * * [T]he following organizations shall be exempt from taxation under this chapter—
* * * * *
"(8) Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes;
* * * * *
"(10) Benevolent life insurance associations of a purely local character, mutual ditch or irrigation companies, mutual or cooperative telephone companies, or like organizations; but only if 85 per centum or more of the income consists of amounts collected from members for the sole purpose of meeting losses or expenses; * * *." 26 U.S.C.A. § 101.
Internal Revenue Code of 1954, § 501, 26 U.S.C.A. § 501, is substantially the same.

nal Revenue appeals. The taxpayer operated low-cost housing units—formerly a Government defense housing project—in Wilmington, North Carolina.

We find Lake Forest, Inc., however, is not "civic", but simply a private cooperative organization; its operation is not a work of "social welfare" but a private economic enterprise albeit in the interest of some of the citizens; and even if its objects include a contribution to social welfare, that is not its aim "exclusively". These conclusions are contrary to the judgment of the Tax Court and require us to reverse.

In March 1947 taxpayer Lake Forest, Inc. entered into an agreement with the Federal Public Housing Authority, succeeded by the Public Housing Administration (both are generally known as PHA) for the purchase of two United States defense housing projects. These projects consisted of 249 one-story residential buildings divided into three, four and five-room apartments, a total of 584 dwelling units. The corporation proposed to devote these properties to a cooperative, nonprofit use as homes for its members.

The price was $1,797,000, payable 5% upon delivery of the deed and the balance in monthly installments over the following twenty-five years. The unpaid purchase money was to be secured by a first mortgage on the property to PHA. Possession under the contract was delivered to the taxpayer on April 1, 1947, and the project was operated by the taxpayer from then until April 1, 1948 as PHA's agent. The initial year was allowed the taxpayer as an interim period to permit it to obtain members, gain experience in running the project and secure funds for the required down payment.

Lake Forest, Inc., organized by World War II veterans and others, had been chartered under the laws of North Carolina with the view of buying the housing project. Indeed, the charter was rigidly drawn as required by the PHA: "To assist veterans of the World Wars to purchase and finance their own homes through acquisition of Lake Forest Projects * * * [according to priorities] defined by the Federal Public Housing Authority. * * * " It was expressly stipulated that the corporation was "not organized for profit and no capital stock is required nor shall any capital stock be issued". The purchase agreement bound the taxpayer to procure PHA approval before amending its charter, bylaws or regulations, and to maintain its status as a nonprofit corporation. Until 1952 one of its 5-member directorate was required to be a representative of PHA.

Membership in the corporation was established by the purchase of "a perpetual use of a dwelling in the Project pursuant to a Mutual Ownership Contract", the number of members being limited to the number of dwellings available. Preference in membership was extended, first, to veterans of World War II presently living in the project and other such veterans who were not then adequately housed; secondly, to veterans of World War I not then adequately housed; thirdly, to veterans of World Wars "regardless of present housing accommodations"; and, fourth, to "other eligible persons".

Each mutual ownership contract was in a form dictated by PHA and substantially provided: acknowledgment of the receipt of $10 membership fee; conferral of the rights and privileges of membership; an agreement by the corporation to sell, and the member to buy, a right of perpetual use and enjoyment of a particular unit at the price as fixed by PHA; and that the right of use would issue if and when taxpayer received a deed to the project. For this right the member promised to pay immediately five per centum of the price, and the balance—with interest—in equal monthly installments.

The members' monthly principal and interest payments were computed so as to be at an end in twenty-five years. But of each member there was also required a monthly operating payment to defray the cost to the taxpayer of operating services and utilities, and to establish reserves therefor. In return, the taxpayer would provide management for the project, pay

property taxes and provide insurance, establishing reserves for these items as well as for vacancy and collection costs, repairs and replacements. Contributions to the reserves were set by PHA. The overall plan was that the aggregate of the prices assigned for the 584 units would amount to the purchase price of the project; the total initial deposits of the members would equal the down payment to PHA; and the monthly installments under the membership contracts would satisfy the monthly principal and interest payable to PHA under the mortgage.

A member could transfer his perpetual use to any member of his family, but to no one else without taxpayer's approval. Should a member desire to leave the project, taxpayer had the option to repurchase the perpetual use, but if the option were not exercised, the member could sell the use to any person acceptable to the taxpayer.

About April 1, 1948 the taxpayer received a deed to the project in fee simple, at the same time making the down payment and executing the requisite note and mortgage. Besides authorizing foreclosure for default, the mortgage stipulated that the taxpayer should not dispose of any interest in the property except by mutual ownership contract and, in furtherance of the security of the debt, included the general operating provisions of the charter and by-laws.

From the very first, and with more particularity since a charter amendment in 1954, each member has been credited on the taxpayer's books with his down payment and entire principal payments under his contract. The principal balance due under his mutual ownership contract and his "net equity" in the perpetual use of his unit were made known or available to each member periodically. Generally, transfers of uses back to the corporation or to other purchasers were handled on the basis of return to the seller of his cash payment and all principal payments under the contract (less a monthly depreciation charge upon the buildings and equipment) plus his proportionate shares of the reserve accounts.

Upon dissolution, members who had paid for them in full would receive conveyances of their respective units; those members who had not fully settled for their uses would receive a fair and equitable adjustment in the distributable assets; all membership dues would be returned without dividend or interest; and the community buildings and all parks and playgrounds would be conveyed to a successor nonprofit corporation, municipal corporation, or eleemosynary corporation, or otherwise disposed of as determined by a majority vote of the membership.

For the years in suit the corporation's gross income has been derived from the monthly operating and principal and interest payments by members. By October 1, 1954 the members' equities amounted to $305,968.45. The corporation's gross income during the years in question ranged from $268,000 to $320,000, net figures after expenses varying from a $19,000 loss to an $18,000 profit.

I. Of course, a taxpayer must bring himself substantially within the terms of a statute granting exemption from taxation to claim the benefit it affords. Madison Newspapers, Inc. v. Comm'r., 253 F.2d 129, 130 (7 Cir. 1958); Producers' Creamery Co. v. United States, 55 F.2d 104 (5 Cir. 1932). Taxpayer insists that "civic" in the statute refers only to "leagues", not to "organizations"; that Lake Forest is not a league; and, ergo, for exemption it need not be a civic body. Whether or not "civic" modifies "organizations", its spirit certainly permeates the entire section. But syntax is not determinative in our conclusions and we treat the adjective as qualifying both "leagues" and "organizations".

"Civic" means, according to the Oxford English Dictionary, Vol. II (1933 ed.):

"1. Of, pertaining, or proper to citizens. 2. Of or pertaining to a city, borough, or municipality. 3. Of or pertaining to citizenship."

The advantages offered by Lake Forest, Inc. do not fulfill this definition. While they are available to all citizens eligible for membership, the benefits are not municipal or public in their nature. Nor are they bestowed upon the commonalty as such. United States v. Pickwick Electric Membership Corp., 158 F.2d 272, 276 (6 Cir. 1946). Lake Forest, Inc. is not a movement of the citizenry or of the community. Rather, at most it is a venture—unquestionably praiseworthy—for securing its members living quarters.

II. Nor is "social welfare" the beneficence sponsored by Lake Forest, Inc. In this context "social" is defined as: "Concerned with, interested in, the constitution of society and the problems presented [thereby] * * *". Oxford Dictionary, supra, Vol. IX. "Society" is "[t]he aggregate of persons living together in a more or less ordered community. * * * A collection of individuals composing a community or living under the same organization or government." Ibid. "Welfare" means "Well-being (of a person, community, or thing)." Id., Vol. XII. In short, "social welfare" is the well-being of persons as a community.

That is neither purposed nor provided by Lake Forest, Inc. It does not propose to offer a service or program for the direct betterment or improvement of the community as a whole. See Debs Memorial Radio Fund, Inc. v. Comm'r., 148 F.2d 948, 951 (2 Cir. 1945); Treas.Reg. § 1.501(c) (4)–1(2)i (1961); Treas.Reg. § 39.101(1)–8 (1951). It is not a charitable corporation in law or equity, for its contribution is neither to the public at large nor of a public character. Owens v. Bank of Glade Spring, 195 Va. 1138, 81 S.E.2d 565, 570 (1954); West v. Lee, 224 N.C. 79, 29 S.E.2d 31, 33 (1944). Lake Forest does, of course, furnish housing to a certain group of citizens but it does not do so on a community basis. It is a public-spirited but privately-devoted endeavor. Its work in part incidentally redounds to society but this is not the "social welfare" of the tax statute.

The playground, park and other recreational accessories, as well as the library and meeting halls of the Forest, concededly have been open to general public use. But this is not by way of dedication: it is more through sufferance than by grant. Whatever the nature of the rights or privileges thus afforded persons other than members, it is a circumstance too insubstantial to qualify the entire activity of the corporation as in the social welfare. Size of membership in ratio to local population is not controlling on whether an organization is "civic" or "social". The number affected is not the criterion. A private project may touch an appreciable segment of the people or a large physical area and yet, for want of the considerations mentioned, not be converted into a civic or social undertaking. Classification as "civic" or "social" depends upon the character—as public or private—of the benefits bestowed, of the beneficiary, and of the benefactor.

Taxpayer offers national policy statements in a number of Acts of Congress relating to housing—the most pertinent enacted after the sale of Lake Forest—to establish that in the sale of the projects the Congress intended that the property should thereafter retain and enjoy a social-welfare status in the hands of the purchaser. See 42 U.S.C.A. §§ 1586, 1587, effective 1950; 2 U.S.Code Cong. Service 1950, p. 2061 et seq. We have been directed to nothing, in our judgment, warranting this conclusion. Indeed, any such implication is denied by the fact here that the property has been sold to a private corporation having no civic, community or public status, and permitted—though as a last classification—to sell shelter not only to veterans but even generally to "[o]ther eligible persons", without delimitation, unless each preceding class exercises its preference in 30 days. While the occupancy perferences may contribute to the promotion of social welfare, they do not overbalance the private nature of the project. Government fostering of social welfare by financing housing construction through private channels or extend-

ing credit in sales of its surplus properties does not of itself establish that the recipients' operations should in addition enjoy tax immunity.

Moreover, Federal regulation of Lake Forest, Inc. through charter design and mortgage clause does not prove the corporation's operations to be in the nature of social welfare. Government control was reserved to protect the security of its loan upon the corporate assets and to assure that the sale is in the "public interest", as stipulated by the Act of 1940, 54 Stat. 1125, Sec. 4 at 1127, which authorized the sale. Such regulation is not unfamiliar practice when the United States lends its credit indirectly or directly, as to a builder or buyer, as illustrated in Federal Housing Administration assistant guarantees. Cf. Loftus v. Mason, 240 F.2d 428, 431 (4 Cir. 1957), cert. den. Shirley-Duke Apartments, Section 1, Inc. v. Mason, 353 U.S. 949, 77 S.Ct. 860, 1 L.Ed.2d 858. If and when the financial risk is removed by anticipatory or maturity payment of the mortgage, Federal rein upon the project will virtually cease. This clearly indicates the essentially private character of the enterprise.

III. The authorities cited by the taxpayer do not persuade us to the exemption. First, for example, is Garden Homes Co. v. Comm'r., 64 F.2d 593 (7 Cir. 1933). It presents a similar but distinguishable undertaking. There the project was conceived, initiated and controlled by the city and county governments of Milwaukee. They also supplied most of the financial support for the corporation which was formed under State laws specially enacted for the purpose. The need for such housing was first investigated and found to be "a problem"; the legislation was passed "to stimulate the erection of homes for wage earners". 64 F.2d at 593.

In the instant case no State or local authority and no civic or community entity has proclaimed similar need for, adopted or subsidized the activity sought to be exempted. Lake Forest as a self-help cooperative deals at arms-length on non-preferential terms with the Government. Government involvement or sponsorship is clearly not indispensable to the exempt status, but it is of course a consideration.

Similar is Hanover Improvement Soc'y., Inc. v. Gagne, 92 F.2d 888 (1 Cir. 1937) whose charter provided, at 889,

"The object of this association shall be the sole purpose of improving the Village Precinct of Hanover by any work or undertaking looking to the introduction, inauguration or betterment of any facility, agency or other service or thing designed or maintained for the common use or benefit of all the people of the community; * * *."

Its acts as a village improvement society —the very "civic league" of the statute— strictly kept to this formula. Profits from the leasing and operating of a motion picture theatre were devoted to the purchase of a fire-alarm system and fire-fighting units for the village, the acquisition of street-department equipment, the construction and beautification of streets, furniture for the village school and corresponding civic needs.

Debs Memorial Radio Fund, Inc. v. Comm'r., supra, 148 F.2d 948 is also framed well within the exemption of the income tax statute. There the taxpayer corporation succeeded to the work of a memorial association in conducting a "free public radio forum for the dissemination of liberal and progressive social views". While the broadcasting station accepted some commercial advertising, this was done only to permit it to send out civic, educational and cultural programs without charge during the best broadcast hours of the day. Unquestionably these benefits accrued to the entire community. No salaries were paid its officers, directors or stockholders; no dividends or any distribution were made to the shareholders.

Again, United States v. Pickwick Electric Membership Corp., supra, 158 F.2d 272 dealt with a situation embraced by the statute. The taxpayer was a public utility corporation organized and run to provide electric energy for several coun-

820

ties under a program authorized and encouraged by the State of Tennessee. One of its purposes was to bring electricity to many communities which had none, as well as to speed the improvement of rural electrification of the area generally. The service and membership could be enjoyed by the public at large and on a nonprofit basis. Although a commercial benefit, it was available to citizens as citizens and promotive of social welfare.

Scofield v. Rio Farms, Inc., 205 F.2d 68 (5 Cir. 1953) does not sustain our taxpayer. In that case the exempted corporation was the creature and pawn of the Farm Security Administration, a Federal agency. For the years in question, all the incorporators and directors were employees of FSA. Its purpose was

" * * * to meet the social problems and assist low-income farm families and individuals within certain areas within the State of Texas, assisting said families and individuals in obtaining agricultural benefits, marketing and otherwise, and in improving their economic position."

Indeed, the project was devoted to experiments and demonstrations for the benefit of farmers generally throughout the Rio Grande Valley, where—as the District Court had found—conditions for smaller farms were "chaotic". The corporation had been held in an independent suit to be in the nature of a charitable trust. It is thus well established as a public benefaction and, moreover, one directed by the United States itself for the two years to which the opinion was expressly limited.

■ We think the argument for exemption of Lake Forest, Inc. as a "like organization" to "[b]enevolent life insurance associations of a purely local character" under Int. Rev. Code of 1939, Sec. 101(10) and Int. Rev. Code of 1954, Section 501(c) (12), footnote 1, ante, is altogether meritless.

IV. At all events, taxpayer's operations are not "exclusively" of the type the statute demands. "Civic" preten-sions and considerations of "social welfare" aside, plainly other substantial realizations motivated and are envisioned by the corporation. Membership affords an instrument whereby an individual can save for a home—in the project or elsewhere—or satisfy other material ambitions, his net equity in the corporation being both redeemable and salable. In achieving this end economies are made possible, through the use of the corporation, which are not available to individuals—equally thrifty and worthy—acting alone. These are advantages wholly proper but nonetheless private gain.

Whether these features also destroy the nonprofit aspect of the corporation we need not decide. But we do decide that the organization and operation of Lake Forest, Inc. are not "exclusively for the promotion of social welfare", since they partake largely of the nature of an economic and private cooperative undertaking. Consumer-Farmer Milk Coop. v. Comm'r., 186 F.2d 68 (2 Cir. 1950); Industrial Addition Ass'n v. Comm'r., 1 T.C. 378 (1942); Amalgamated Housing Corp. v. Comm'r., 37 B.T. A. 817 (1938). The impact on the tax status of purposes other than those required to be "exclusive" under such an act of Congress is bluntly stated in Better Business Bureau v. United States, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67 (1945) in not too different circumstances:

" * * * [I]n order to fall within the claimed exemption, an organization must be devoted to educational purposes *exclusively*. This plainly means that the presence of a single noneducational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes." (Emphasis added.)

The judgment of the Tax Court will be reversed and the proceeding remanded there for determination of the other issues presented by the petition of Lake Forest, Inc. and not reached by the Tax Court.

Reversed and remanded.