*Decision will be entered under Rule 50.*

PEOPLE'S EDUCATIONAL CAMP SOCIETY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 82223. Filed February 12, 1963.

*I. Herman Sher, Esq.*, for the petitioner.
*Robert A. Trevisani, Esq.*, and *Joseph Wilkes, Esq.*, for the respondent.

PIERCE, *Judge:* Respondent determined a deficiency of $25,784.43 in the income tax of the above-named petitioner corporation for its fiscal year ended September 30, 1956.

The sole issue for decision is whether, for said taxable year, the petitioner corporation is entitled to exemption from Federal income tax under section 501(c)(4) of the 1954 Code. This section, in material part, provides exemption for:

(4) Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare * * *.

### FINDINGS OF FACT.

Some of the facts have been stipulated. The written stipulation of facts, including all exhibits made a part thereof, is incorporated herein by reference.

The petitioner, People's Educational Camp Society, Inc., is a New York membership corporation with principal office in New York, N.Y. It filed a corporation income tax return for the taxable year here involved, with the district director of internal revenue for the Lower Manhattan district of New York.

### *Facts re Creation of Petitioner, and its Form of Organization.*

In 1920 and for several years prior thereto, the American Socialist Society, which was a New York membership corporation, operated a school in New York City that was known as the Rand School of Social Science. (As hereinafter shown, both said American Socialist Society and said school have since ceased to exist.) The Rand School at that time conducted classes for adults, composed principally of wage earners and immigrants; and it also presented lectures and programs related to the development and dissemination of liberal and progressive views pertaining to the so-called labor movement and to socialist principles.

During said year 1920, officials and friends of the Rand School learned that a tract of 2,196 acres of mountainous and wooded land, located in the Pocono Mountains of Pennsylvania near Bushkill, Pike County, Pa., was for sale. This acreage had theretofore been part of a larger tract which, prior to the outbreak of World War I, had served as a summer camp and recreation area for German-Americans; and subsequently, a portion of this larger tract had been acquired by the International Ladies Garment Workers Union as a summer vacation area for its members. The officials of Rand School immediately became interested in buying said 2,196 acres, with a view to developing a campsite thereon where its faculty, students, and friends might gather during summer periods, and there carry on their studies and continue their development of the liberal and progressive social programs in which they were interested.

Pursuant to such objective, Bertha Howell Mailly who was the executive secretary of the Rand School, thereupon obtained an option to purchase said 2,196 acres for a price of about $21,000. And then on December 6, 1920, the petitioner corporation was organized under the Membership Corporation Law of the State of New York, to take title to said property and develop thereon the contemplated summer camp and recreation area. This plan was given effect. The camp was named "Tamiment," after the name of a lake that adjoined the property.

Petitioner's certificate of incorporation stated that the objects of the corporation were to be as follows:

To organize, conduct and maintain summer camps and centers for instructive and recreative purposes; to build, purchase, own, lease, manage and operate camps, dormitories, dining halls, recreation rooms, play grounds, reading rooms, halls, and other buildings for the purpose of said corporation as herein set forth; to diffuse a general knowledge of literature, art and science through the medium of lectures, publications and dramatic performances; to borrow money for the corporate purposes of the corporation and to issue bonds, notes or other evidences of indebtedness therefor; to assist other educational, civic, political and economic movements and organizations; to cooperate with such organizations and movements and to initiate such movements, but said purposes shall not extend to those objects for which corporations may be formed pursuant to the Education Law, nor shall any activities of the said corporation be conducted for pecuniary profit to its members.

The latter limitation relating to the Education Law was inserted at the direction of the secretary of state of New York in order to make clear that petitioner had no power or authority to operate a school.

Petitioner, having been organized as a membership corporation, has never issued any shares of stock or had any stockholders. It is controlled by not more than 35 individuals, known as members, who from time to time are elected in accordance with the following provision of its bylaws, as amended:

ARTICLE III.

*Membership.*

Section 1. Any person may be elected to membership in the Society, provided that he has publicly subscribed to the principles of Socialism for a period of at least two years, and provided that his admission to such membership has been recommended by the Board of Directors acting as Membership Committee and has been approved by a vote of at least two-thirds of all members present and voting at a regular meeting or at a special meeting called for that purpose.

\*      \*      \*      \*      \*      \*      \*

Section 3. The membership of the Society shall at no time exceed thirty-five.

The day-to-day operations of petitioner are conducted by a managing director and an associate director, who are hired by a board of five directors. The individuals comprising this board of directors are elected by the members; and said members also elect the officers of petitioner, who are: A president, a vice president, and a secretary and treasurer. None of the officers or directors receive any salary or other compensation for their services; but the managing director, associate director, and other employees do receive salaries.

Petitioner's bylaws contain the following provision with respect to dissolution of the corporation:

ARTICLE XV.

*Dissolution.*

Section 1. The Society cannot be dissolved as long as there are seven (7) members who desire to maintain the organization.

Section 2. In the event of dissolution of the Society the property of the Society shall revert to the American Socialist Society of New York.

Said American Socialist Society ceased to exist in March 1956; but thereafter, no steps were taken to amend the above provision or to designate how petitioner's properties will be disposed of in the event of dissolution. No plan for dissolution was ever contemplated.

*Facts re Growth of Tamiment From 1921 to 1956.*

Camp Tamiment was opened for occupancy, on a modest scale, in July 1921; and during the 20-year period that followed, the camp experienced a steady though moderate growth. Beginning with the first fiscal year, and for all subsequent years except 1925 and 1932 when small operating losses were incurred, Tamiment has produced substantial profits. And, except during the initial period from 1921 through 1923, petitioner has never solicited or received any contributions, but has been entirely self-sustaining. By the end of said 20-year period ended in 1941, the amount of petitioner's fixed assets (substantially all of which represented buildings and facilities at

Tamiment) increased to approximately $398,600; and also the amount of its annual gross income increased to approximately $281,600.

In January 1936, petitioner obtained a ruling from the Commissioner of Internal Revenue that, on the basis of the facts then available, it was exempt from Federal income taxation under section 101(8) of the Revenue Act of 1934. And in January 1939, it obtained a similar exemption ruling, with respect to those provisions of the 1939 Code which are cognate to section 501(c)(4) of the 1954 Code that is here involved.

In 1942, which followed the outbreak of World War II, both the guest occupancy at Tamiment, and also the amount of petitioner's gross income therefrom, began to increase substantially. And beginning in 1946 (following the end of World War II), the amounts of petitioner's fixed assets, operating expenses, and accumulated surplus (designated in its books and records as "Reserves"), likewise all began to increase rapidly. The extent of the increases in these items per books, during the period from 1922 through 1957, are shown in the following table:

| Fiscal year | Total assets | Total liabilities | Surplus (designated "reserves") | Total income | Total costs | Net income |
|---|---|---|---|---|---|---|
| 1922 | $122,451.36 | $103,034.88 | $19,416.48 | $72,969.46 | $54,242.35 | $18,727.11 |
| 1931 | 206,190.44 | 102,301.20 | 103,889.24 | 135,059.38 | 133,298.53 | 1,760.85 |
| 1941 | 398,663.93 | 87,583.96 | 311,079.97 | 281,633.87 | 224,657.83 | 56,976.04 |
| 1946 | 1,021,789.07 | 88,638.39 | 933,150.68 | 683,610.86 | 485,103.67 | 198,507.19 |
| 1951 | 1,124,229.91 | 50,777.77 | 1,573,452.14 | 823,413.21 | 725,581.38 | 97,831.83 |
| 1955 | 2,175,284.54 | 50,682.21 | 2,124,602.33 | 901,406.86 | 822,162.80 | 79,244.06 |
| 1956 | 2,301,604.74 | 75,524.24 | 2,226,080.50 | 932,001.45 | 895,667.13 | 36,334.32 |
| 1957 | 2,368,575.94 | 61,478.05 | 2,307,097.89 | 951,014.11 | 908,935.68 | 42,078.43 |

NOTES:
(1) Figures for all years from 1922 through 1960, including those for intermediate years not shown in the above table, have been stipulated as Exhibits 8-H and 15-O.
(2) All figures are for fiscal years ended September 30, except those for the year 1922 which are for a fiscal year ended October 31.
(3) For the year 1956, the amount of petitioner's net income per books as shown in the last column of the above table, was adjusted and increased by the Commissioner in his notice of deficiency herein to $60,994.87; and the correctness of this adjustment has not been disputed by petitioner.
(4) The stipulated figures for "total income" in the above table are based in part upon net income from the operations of Sandyville; and they also do not include income of petitioner's Mailly Educational Fund. Both Sandyville and the Mailly Fund are described herein below. The adjusted figures appearing in tables I and II, *infra*, representing the *total revenues* of the petitioner, reflect the *gross receipts* from Sandyville, as well as the income of the Mailly Fund.

*Facts re Petitioner's Facilities and Activities at Tamiment, During the Taxable Year 1956 and Adjacent Years.*

By the taxable year 1956 here involved, Tamiment had become the largest and one of the most modern summer vacation resorts in the Commonwealth of Pennsylvania. There, most of petitioner's fixed assets were located, most of its income was derived, and most of its expenditures were made.

By this time, both the American Socialist Society and the Rand School, which in 1921 had been instrumental in creating the petitioner for the primary purpose of having it develop Camp Tamiment as a

summer retreat for the faculty, students, and friends of said school, had ceased to be operative. And also by this time, the facilities at Tamiment had been enlarged and improved to a point where they were sufficient to provide accommodations for more than 900 guests. The resort was open to the general public. It operated competitively with other mountain resorts in the area. And it was advertised by petitioner under the name "Tamiment in the Poconos," not only in New York City newspapers and magazines, but also through multi-colored brochures,[1] wherein it was described as a luxurious resort for summer vacations.

The rates for guests at Tamiment ranged from $12 to $19 per day per person, or from $70 to $115 per week per person. These rates were based on the American plan, and covered room, meals, concerts, lectures, and the use of all athletic facilities (except for green fees at the golf course). Most of the guests were young intellectual adults, who were attracted by the facilities and activities there available, and who were willing and able to pay such charges.

Tamiment's principal facilities, during said year 1956, included the following. The main living accommodations for guests consisted of more than 160 attractively furnished cottages, located adjacent to a large central dining hall. These cottages would accommodate about 900 guests; and the dining hall was sufficiently large to provide meals for 1,000 people at one sitting. Also, set apart from these cottages was a group of about 33 bungalows of more modest character, known as Sandyville. These bungalows were designed for use by families with children. They were equipped for light housekeeping; and they were adjacent to a small store, and to a play school for children.

Other physical facilities at Tamiment included an administration building; a library; a lecture and concert hall; a large ballroom building; taverns; a clubhouse and dining terrace overlooking the lake; an 18-hole golf course; another large clubhouse overlooking the golf course, which contained a cocktail lounge called the Constellation Room; a theater building with substantial seating capacity; 18 tennis courts; a beach house on the lake where facilities for swimming and fishing were available; and more than 100 canoes and rowboats. In addition, there were shuffleboard courts, volley ball and badminton courts, handball courts, and provisions for baseball, soft ball, and basketball. During the peak season, approximately 400 employees were engaged in maintaining and operating the above-mentioned facilities.

Tamiment also offered organized programs for guests who were interested in the theater, music, and art. At the theater building, mov-

---

[1] Two of these illustrative brochures are included in the evidence as exhibit 40–NN.

ing pictures were provided. And on each Saturday evening and each Sunday afternoon, there was a play, musical comedy, or a revue with ballet. The latter were produced by a group of young actors employed by petitioner, who served under a director and staff employed for such purpose. There also was a 14- to 16-piece orchestra which provided music for the comedies and revues; and, after the conclusion of such presentations and also on other evenings, this orchestra divided into two sections and provided music for dancing at two locations.

For those guests who were interested in art, instructions in painting and drawing were given without charge by an art director that petitioner employed. Also at times during each summer season, various professional artists (including both painters and sculptors) were invited to display their works at Tamiment, and there offer the same for sale.

On one evening of each week, a lecture was presented, usually by an author or a specialist on some subject of general interest. The topics of these lectures pertained to literature, art, or current domestic or international affairs.

Perhaps the most outstanding of the cultural programs presented at Tamiment was a 4-day chamber music festival that was held annually in June, at about the time of the opening of the resort's summer season. This featured an outstanding chamber music orchestra and string quartet composed of professional musicians from Philadelphia, which presented classical and other musical selections of the highest quality. Here likewise, no admission was charged to guests of the resort, but a moderate charge was made to others who attended.

Also on one evening of each week throughout Tamiment's summer season, concerts or recitals by vocalists, pianists, and others were offered for the guests.

*Facts re Other Facilities and Activities of Petitioner in New York City, During the Taxable Year 1956.*

In 1951, petitioner acquired title from the American Socialist Society through a mortgage foreclosure, to the land and building located at 7 East 15th Street, in New York City. This building housed, at the time, the above-mentioned Rand School of Social Science which was then being operated by the American Socialist Society; said school's library; the offices of the New Leader, a magazine published by a separate corporation, which was devoted to the dissemination of liberal and progressive social views; and the principal corporate office of the petitioner. Later, in March 1956 when the American Socialist Society was dissolved, all the property and assets of said library were transferred by said society to petitioner, apparently without consider-

ation; and thereafter petitioner itself maintained and operated this library.

The library contained one of the largest and most complete collections of books, pamphlets, and other materials dealing with the history of the labor movement, socialism, and communism. After petitioner took over the maintenance and operation of the library, it renovated the same, employed a librarian and other employees, and made the facilities available to persons engaged in research in the above-mentioned fields.

Also petitioner, acting under the name of "Tamiment Institute," sponsored and promoted several activities relating in general to social welfare. Most of these activities were centered in New York City; and they included: Annual musical composition contests and college student essay contests, for which prizes were awarded; an annual book award luncheon, at which a prize was awarded for the best biographical book of the year; an annual public forum conducted by a panel of prominent citizens, which dealt with current domestic and international questions; the publication and circulation from time to time of pamphlets on matters of public interest; the insertion in magazines from time to time of public service advertisements; and the sponsorship of annual seminars held at Tamiment before the opening of that resort's summer season, at which papers dealing with problems of current interest were read and discussed.

*Analyses of Petitioner's Revenues, Expenditures, and Financial Condition for the Years 1953 through 1957.*

The several tables or schedules hereinafter set forth show in summary form the amounts of petitioner's total revenues, the principal disposition made of such revenues, and also the amounts of its assets, liabilities, and accumulated surplus for each of the years 1953 through 1957.

TABLE I.—*Summary of total revenues and principal dispositions of such revenues for fiscal years ended September 30, 1953 through 1957*

| Fiscal year ended Sept. 30— | Total revenue from all sources | Expenditures for social welfare activities | Operating expenses | Capital additions and reductions | Contributions to other organizations |
|---|---|---|---|---|---|
| 1953 | $968,004.85 | $13,378.44 | $736,016.76 | ($33,087.40) | $49,547.00 |
| 1954 | 956,911.51 | 28,550.86 | 768,208.74 | 35,962.05 | 36,781.15 |
| 1955 | 918,558.59 | 47,636.86 | 754,377.86 | (6,236.67) | 28,942.00 |
| 1956 | 942,612.55 | 44,684.76 | 853,107.36 | 221,302.34 | 4,000.00 |
| 1957 | 979,579.07 | 70,718.27 | 856,150.94 | 20,952.05 | 4,000.00 |
| Totals | 4,765,666.57 | 204,969.19 | 3,967,861.66 | 238,892.37 | 123,220.15 |

TABLE II.—*Sources of above total revenues*

| | Fiscal year ended September 30— | | | | |
|---|---|---|---|---|---|
| | 1953 | 1954 | 1955 | 1956 | 1957 |
| Gross income from guests at Tamiment resort | $904,689.73 | $896,161.06 | $851,581.38 | $886,591.23 | $907,682.36 |
| Gross income from Sandyville | 32,181.36 | 32,141.39 | 31,538.91 | 30,999.89 | 33,655.72 |
| Net income from taverns at Tamiment resort [1] | 20,904.49 | 14,958.68 | 16,693.00 | 11,624.94 | 12,430.93 |
| Gross income from assets in Mailly Educational Fund [2] | 10,279.01 | 12,811.39 | 13,971.67 | 13,730.00 | 13,980.00 |
| Miscellaneous income from other sources | 3,584.70 | 4,832.78 | 5,184.41 | 5,730.51 | 11,830.06 |
| Net loss on operation and maintenance of building at 7 E. 15th [1] | (3,634.44) | (3,993.79) | (410.78) | (6,064.02) | -------------- |
| Petitioner's total income from all sources | 968,004.85 | 956,911.51 | 918,558.59 | 942,612.55 | 979,579.07 |

[1] The evidence of record does not contain the items of gross income and expenses relative to sales of liquor in petitioner's dining room and taverns at Tamiment, or those related to the operations of petitioner's building at 7 East 15th St. in New York City. Petitioner sold said building at 7 East 15th St. early in 1957, and consequently had no operating gain or loss for that year.
[2] The origin and composition of the Mailly Educational Fund is hereinafter described.

TABLE III.—*Analysis of above expenditures for social welfare activities*

| Fiscal year ended Sept. 30— | Seminars and symposia | Education [1] | Library in New York City | Book awards | Public service publicity | Public forums | Miscellaneous | Total social welfare expenditures |
|---|---|---|---|---|---|---|---|---|
| 1953 | $2,956.00 | $4,336.67 | ---------- | $5,085.77 | $1,000.00 | ---------- | ---------- | $13,378.44 |
| 1954 | 1,774.20 | 4,866.67 | ---------- | 4,739.99 | 17,170.00 | ---------- | ---------- | 28,550.86 |
| 1955 | 2,650.00 | 8,033.33 | ---------- | 4,503.42 | 23,492.76 | $3,957.35 | $5,000.00 | 47,636.86 |
| 1956 | 3,466.70 | 9,045.67 | $3,898.62 | 6,277.93 | 19,870.69 | 2,125.15 | ---------- | 44,684.76 |
| 1957 | 4,045.00 | 9,433.00 | 24,050.48 | 5,049.17 | 19,963.51 | 30.00 | 8,147.11 | 70,718.27 |

[1] These expenditures represent salary paid to petitioner's "educational director" who supervised the other activities herein shown. As above found, petitioner is not authorized to, and does not, conduct any school; nor does it grant scholarships to any school.

In table I, *supra*, there has been included a summary of petitioner's operating expenses. Such expenses include those for providing physical recreation and also cultural programs and activities at Tamiment. The amounts so expended for these purposes were as follows:

TABLE IV

| Fiscal year ended Sept. 30— | Expenditures for— | |
|---|---|---|
| | Physical recreation | Cultural programs and activities |
| 1953 | $16,732.31 | $85,666.61 |
| 1954 | 33,604.19 | 79,787.21 |
| 1955 | 27,980.04 | 80,565.17 |
| 1956 | 28,147.33 | 82,746.41 |
| 1957 | 22,981.39 | 87,178.45 |

The following table V shows an analysis of petitioner's contributions and donations to other organizations for each of the years 1953 through 1957:

TABLE V.—*Contributions made to other organizations*

| | Fiscal year ended September 30— | | | | |
|---|---|---|---|---|---|
| | 1953 | 1954 | 1955 | 1956 | 1957 |
| Rand School | $27,300 | $23,172.15 | $22,500 | | |
| League for Industrial Democracy | 4,000 | 5,000.00 | 3,028 | $4,000 | $4,000 |
| Jewish Labor Committee | 2,500 | | 1,000 | | |
| American Labor Conference | 6,000 | 3,000.00 | | | |
| International Rescue Committee | 3,900 | 4,000.00 | | | |
| Monroe County Community Chest | 600 | 700.00 | 700 | | |
| General Hospital, Monroe County, Pa | 500 | 500.00 | | | |
| Milk & Egg League | | 150.00 | | | |
| Monroe County—YMCA Bldg. Fund | 500 | | 500 | | |
| Flood Relief | | | 1,000 | | |
| Miscellaneous other donations | 247 | 309.00 | 214 | | |
| Total | 45,547 | 36,831.15 | 28,942 | 4,000 | 4,000 |

The following table VI shows the amounts of petitioner's assets, liabilities, and accumulated surplus, as of the end of its fiscal years 1953 through 1957:

TABLE VI.—*Comparative balance sheets*

| Assets | Fiscal year ended September 30— | | | | |
|---|---|---|---|---|---|
| | 1953 | 1954 | 1955 | 1956 | 1957 |
| Current assets: | | | | | |
| Cash | $314,094.36 | $351,184.47 | $393,288.41 | $245,502.53 | $262,400.76 |
| Mailly Educational Fund | 447,664.27 | 492,348.96 | 539,240.63 | 550,270.63 | 557,895.84 |
| Inventories | 38,929.68 | 46,569.53 | 50,680.30 | 13,260.49 | 13,460.99 |
| Receivables | 740.51 | 3,140.00 | 6,784.50 | 681.83 | 128,734.02 |
| U.S. Government obligations | | | | 99,940.63 | 97,835.11 |
| Prepayments | 27,683.34 | 28,637.75 | 31,202.12 | 41,621.73 | 42,414.65 |
| Fixed assets (net after depreciation): | | | | | |
| At Tamiment and Sandyville: | | | | | |
| Land | 25,283.08 | 25,283.08 | 25,283.08 | 25,283.08 | 25,283.08 |
| Roads and land improvements | 32,492.45 | 32,047.52 | 32,402.59 | 32,357.66 | 31,099.66 |
| Golf course | 140,474.95 | 141,062.00 | 140,149.05 | 139,236.09 | 138,323.13 |
| Buildings | 630,682.93 | 666,328.80 | 668,186.61 | 782,804.77 | 813,839.20 |
| Equipment | 164,921.39 | 164,695.45 | 157,558.85 | 188,547.99 | 178,060.69 |
| "Permanent inventory" | | | | 56,327.93 | 56,327.93 |
| At New York City: | | | | | |
| Library books | | | | 19,425.00 | 16,275.00 |
| Library equipment | | | | 900.00 | 2,174.00 |
| Leasehold improvements | | | | | 4,451.68 |
| Land, buildings and improvements at 7 East 15th St | 106,208.10 | 102,214.31 | 101,803.53 | 77,511.51 | |
| Society of the Commonwealth Center [1] | 28,704.87 | 28,704.87 | 28,704.87 | 27,932.87 | |
| Total assets | 1,957,879.93 | 2,082,616.74 | 2,175,284.54 | 2,301,604.74 | 2,368,575.94 |
| Total liabilities | 44,329.61 | 45,705.36 | 50,682.21 | 75,524.24 | 61,478.05 |
| Accumulated surplus [2] | 1,913,550.32 | 2,036,911.38 | 2,124,602.33 | 2,226,080.50 | 2,307,097.89 |
| Total liabilities and accumulated surplus | 1,957,879.93 | 2,082,616.74 | 2,175,284.54 | 2,301,604.74 | 2,368,575.74 |

[1] This item is not identified in the evidence.
[2] Denominated by petitioner in its books and records as "Reserves."

The Mailly Educational Fund, which is listed among the assets in the above comparative balance sheets, represents a segregation of a portion of petitioner's assets which was effected in 1944 pursuant to resolutions of petitioner's members and directors. The fund was stated to be for educational purposes. The assets of the fund consisted principally of United States Government bonds. The only disbursements made from the income of this fund from the time of its creation through 1957 were annual payments of $2,700 each, made in the period 1954–1957, to help defray the expenses of operating the above-mentioned children's play school at Sandyville. In 1956 and 1957, a minor portion of the assets of this fund was used in erecting a new cultural center building at Tamiment.

The assets of the Mailly Fund at the end of each of the years 1953 through 1957 are shown in the following table VII:

TABLE VII.—*Mailly Educational Fund assets*

| Fiscal year ended September 30— | U.S. Government bonds | Cultural Center Bldg. | Other assets |
| --- | --- | --- | --- |
| 1953 | $446,212.50 | | $1,451.77 |
| 1954 | 493,540.63 | | 1,508.33 |
| 1955 | 543,140.63 | | 1,500.00 |
| 1956 | 542,490.63 | $5,925.80 | 1,854.20 |
| 1957 [1] | 542,090.63 | 87,149.20 | 1,500.00 |

[1] At December 31, 1957, the Mailly Fund was indebted to petitioner's General Fund in the amount of $72,843.99.

Under date of March 3, 1956, the Commissioner of Internal Revenue issued a letter-ruling to petitioner, in which he revoked the previous above-mentioned rulings of 1936 and 1939 in which petitioner had been granted exemption from Federal income taxes. This new ruling stated in part:

Your *primary* activity is the operation of a summer camp known as "Camp Tamiment" * * *.

\*        \*        \*        \*        \*        \*        \*

An organization whose *primary* purpose is the operation of a summer resort, a business ordinarily carried on for profit, does not meet the requirements of section 501(c)(4) of the Code as an organization not organized for profit but operated exclusively for the promotion of social welfare within the intendment of that section of the law. Furthermore, the fact that the organization distributes a portion of its profits to charitable and other organizations does not establish that it is operated for purposes beneficial to the community as a whole.

Upon further consideration of all the information available in your case, it is our conclusion that in operating the camp and your other facilities, including the store, tavern and bungalows, which are advertised and open to the public, you are engaged *primarily* in operating commercial enterprises which constitute businesses ordinarily carried on for profit. Accordingly, it is held that you are not entitled to exemption from Federal income tax under the provisions of section 501(c)(4) of the Code of 1954 * * *.

* * * this ruling will not be applied retroactively * * * to the fiscal year ended September 30, 1955, and prior fiscal years. You will be required, however, to file income tax returns for the fiscal year ended September 30, 1956, and subsequent fiscal years. [Emphasis supplied.]

Petitioner thereafter filed a corporation income tax return (Form 1120) for its fiscal year 1956 here involved, in which it reported the amounts of its income and deductions, but claimed exemption from tax. The Commissioner, upon audit of this return, determined the deficiency here involved. The correctness of the amount of this deficiency is not disputed, if petitioner is held to be not exempt from income tax liability.

### ULTIMATE FINDINGS OF FACT.

Petitioner was primarily engaged during the taxable year in the operation of the resort at Tamiment; and its activities in operating said resort did not in themselves constitute, and were not merely incident to, the promotion of social welfare.

Petitioner was not operated during the taxable year involved either exclusively or principally for the promotion of social welfare.

### OPINION.

The basic issue in this case is whether the petitioner corporation, for its taxable year 1956, is entitled to exemption from income tax under section 501(c)(4) of the Internal Revenue Code of 1954. Said section, as hereinbefore noted, grants exemption from income tax to: "Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare * * *."

The dispute between the parties centers on the nature and effect of petitioner's activities during the taxable year in operating the large and luxurious vacation resort in Pennsylvania, known as "Tamiment in the Poconos." The specific question to be decided, which will be dispositive of the case, is whether petitioner's operation of this resort, when considered in relation to its activities as a whole, precludes the petitioner from qualifying for exemption under the above statute, as an organization "operated exclusively for the promotion of social welfare."

We are impelled to decide that said question must be answered in the affirmative; and that the Commissioner's ruling and position that petitioner is not exempt from income tax for the year involved, must be sustained. Our principal reasons for this decision are as follows.

1. We are convinced that petitioner's activities in operating the resort at Tamiment during the taxable year were not "exclusively," or even principally or primarily, "for the promotion of social welfare" within the meaning of the statute. As the Supreme Court

stated in the early case of *Trinidad* v. *Sagrada Orden*, 263 U.S. 578, the statutory exemptions granted to various types of organizations evidently were made in recognition of the benefits which the *public* derives from such organizations' activities. And both the pertinent Treasury regulation and judicial authority recognize that the existence of a primary or predominant purpose to yield benefits *to the community as a whole* is an essential prerequisite to the allowance of such statutory exemptions from tax.

Income Tax Regs., section 1.501(c)(4)–1, which relates to the particular statutory provision here involved that allows exemption to certain organizations "operated exclusively for the promotion of social welfare," states in part as follows:

An organization is operated exclusively for the promotion of social welfare if it is *primarily* engaged in promoting in some way the *common good and general welfare of the people of the community.* An organization embraced within this section is one which is operated *primarily* for the purpose of bringing about civic betterments and social improvements. * * *

* * * an organization [is not] operated primarily for the promotion of social welfare if *its primary activity* is * * * carrying on a business with the general public in a manner similar to organizations which are operated for profit. * * * [Emphasis supplied.]

Also, in the recent case of *Commissioner* v. *Lake Forest, Inc.*, 305 F. 2d 814, wherein it was held on the basis of the particular facts there involved that a veterans' cooperative housing project did not qualify for exemption as a social welfare organization, the Court of Appeals for the Fourth Circuit stated:

"social" is defined as: "Concerned with, interested in, the constitution of society and the problems presented [thereby] * * *." Oxford Dictionary, supra, Vol. IX. "Society" is "[t]he aggregate of persons living together in a more or less ordered community * * * A collection of individuals composing a community or living under the same organization or government." Ibid. "Welfare" means "Well-being (of a person, community, or thing)." Id., Vol. XII. In short, *"social welfare" is the well-being of persons as a community.* [Emphasis supplied.]

Applying these principles in the instant case, we are satisfied that petitioner's activities in maintaining and operating the large resort at Tamiment, were not directed to, and did not result in, providing benefits either for the public at large, or for any community as a whole. Rather, the facilities and activities at said resort were devoted principally and primarily to providing living accommodations, meals, and a variety of recreational and cultural programs for the personal benefit of paying guests, who were attracted to the resort because it was an enjoyable and luxurious place for summer vacations, and who were willing and able to pay the substantial daily or weekly overall rates which petitioner charged.

True it is, that both the recreational and cultural activities provided, did benefit those who participated in them.  But, when the same are considered in light of the fact that they were furnished for financial consideration, and were paid for by the guests as part of the "package rates" charged therefor, we think it would be overstretching the meaning and intent of the tax exemption statute to include them within the ambit of "promotion of social welfare."

2. We are convinced also, that the operation of Tamiment was petitioner's *primary activity*, and not merely *incidental* to those social welfare activities which petitioner carried on, principally in New York City.

In the findings of fact hereinabove made, we have described in detail, the nature of petitioner's operations and activities both at Tamiment and at New York City, during 1956 and the preceding and following years; and we also have included therein, several schedules or tables based on petitioner's books and records, which reveal the fiscal aspects of the operations and activities at both of said locations.  These findings show that, throughout the period from 1953 through 1957 which includes the taxable year involved, most of petitioner's fixed assets were located at Tamiment; most of its income was derived there; and also most of its expenditures were made there.  In addition, most of petitioner's personnel, which during the summer seasons included approximately 400 employees, were engaged primarily in the maintenance and operation of said resort.

What is even more significant, is the fact that petitioner's total revenues from all sources (which for the year 1956 totaled approximately $942,600, and which were derived almost entirely from the operation of Tamiment) were disposed of principally in handling the operating expenses of said resort, in enlarging and improving the resort's facilities, and in making additions to petitioner's accumulated earned surplus; and that, by comparison, only a relatively insignificant portion of such total revenues was expended in the promotion of social welfare activities.  This is made evident by the following figures taken from tables II, III, and VI of our Findings of Fact:

| Fiscal year ended Sept. 30— | Total revenues | Expenditures for social welfare activities | Accumulated earned surplus |
| --- | --- | --- | --- |
| 1953 | $968,004.85 | $13,378.44 | $1,913,550.32 |
| 1954 | 956,911.51 | 28,550.86 | 2,036,911.38 |
| 1955 | 918,558.59 | 47,636.86 | 2,124,602.33 |
| 1956 | 942,612.55 | 44,684.76 | 2,226,080.50 |
| 1957 | 979,579.07 | 70,718.27 | 2,307,097.89 |

The situation thus presented is similar to that considered by the Court of Claims in the recent case of *Scripture Press Foundation* v. *United States*, 285 F. 2d 800, certiorari denied 368 U.S. 985. There, a nonprofit, nonstock corporation claimed exemption from income tax under section 101(6) of the 1939 Code, on the ground that it "operated exclusively" for religious purposes—notwithstanding that one of its activities was the sale of religious literature, from which it derived substantial revenues and from which it accumulated increasing amounts of capital and surplus. The Court of Claims, after considering the fiscal aspects of the organization's operations and after extensively reviewing the pertinent judicial authorities, denied the claimed exemption—on the grounds that sale of literature for profit was the *primary*, and not an *incidental*, activity of the taxpayer; and hence, that the statutory condition (i.e., that the organization be "operated exclusively" for religious purposes) had not been met. The court stated in part as follows

We think the enormity of the contrast between what plaintiff has accumulated from sales each year and what it has expended for its [religious] educational programs reveals that the sale of religious literature is its primary activity and that its instructional phase is incidental thereto. * * * the disparity between amounts actually expended for instruction when compared with amounts realized in earnings is unaccountably small.[10]

\*        \*        \*        \*        \*        \*        \*

In summary, we are compelled to reach a conclusion that plaintiff's activities are of a nonexempt character. We find that the crucial factor, in the light of the evidence, is that the sales aspect of plaintiff's work looms so large as to overshadow all else. [Footnote omitted.]

Other cases in which an organization has been denied exemption from tax, on the ground that certain nonexempt activities were sufficiently important to preclude qualification under the "operated exclusively" condition of the statutes there involved, include the following: *Better Business Bureau* v. *United States*, 326 U.S. 279 (1945); *Consumer-Farmer Milk Coop.* v. *Commissioner*, 186 F. 2d 68 (C.A. 2, 1950), affirming 13 T.C. 150, certiorari denied 341 U.S. 931; and *Phinney* v. *Dougherty*, 307 F. 2d 357 (C.A. 5, 1962).

In the *Better Business Bureau* case, the question was whether the taxpayer was exempt from social security taxes, as a corporation organized "exclusively" for scientific or educational purposes within the meaning of section 811(b)(8) of the Social Security Act which repeats almost *in haec verba*, the language of section 101(6) of the Internal Revenue Code of 1939. There the Supreme Court, after pointing out that the taxpayer was not devoted to scientific purposes, and that "an important, if not the primary pursuit" was noneducational, denied the exemption—saying:

In this instance, in order to fall within the claimed exemption, an organization must be devoted to educational purposes exclusively. This plainly means that

the presence of a single non-educational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes. * * *

In the *Consumer-Farmer Milk Coop.* case, the taxpayer claimed exemption as an organization "operated exclusively for the promotion of social welfare" under section 101(8) of the 1939 Code (which section is cognate to the provision of the 1954 Code that is involved in the instant case). The Second Circuit, in denying the exemption (principally because the cooperative's profits might be applied as rebates to its members) stated in part:

Concededly it [the cooperative] has been engaged to some extent in promoting social welfare. But it has not been exclusively so engaged. Where only a small portion of the cooperative's net income is used for education or other public purposes, it is difficult to find sufficient public dedication to justify relief from taxation. To qualify for exemption, profit derived from commercial activities must not only be incidental to the ultimate charitable purpose; it must also be devoted to that purpose.[2] * * *

In the third case above cited, *Phinney* v. *Dougherty*, the Fifth Circuit decided that a gift made to a Students Aid Fund which had been incorporated as a nonprofit corporation, was not allowable as a charitable deduction—because said incorporated fund was not "operated exclusively" for educational purposes. The court said:

The fraternity house [which the fund provided and maintained] serves both the educational purposes of the University and the social purposes of the fraternity. In order, however, that the Fund be "organized and operated exclusively for * * * educational purposes," education must be its primary purpose or function and such of its activities as do not serve to further education must be so minor in comparison as to be termed incidental.

In our opinion the Fund does not meet that test. * * * The purpose of serving the purely social purposes of the fraternity can not be said to be minor and incidental to its broader educational purposes. * * *

See also the following additional cases in which the statutory words "operated exclusively," were given effect in denying exemption from tax: *American Institute for Economic Research* v. *United States*, 302 F. 2d 934 (Ct. Cl. 1962); *United States* v. *Community Services*, 189 F. 2d 421 (C.A. 4, 1951), certiorari denied 342 U.S. 932; *Ralph H. Eaton Foundation* v. *Commissioner*, 219 F. 2d 527 (C.A. 9, 1955),

---

[2] Another case decided by the Second Circuit, *Debs Memorial Radio Fund* v. *Commissioner*, 148 F. 2d 948 (1945), reversing 3 T.C. 949, is distinguishable on its facts, both from the above case and also from the instant case. There the taxpayer's primary activity was the operation of a free public radio forum for educational, cultural, and social services. And, although it derived part of its funds for such purposes from commercial broadcasting, the Second Circuit allowed the exemption—saying:

The purpose of its commercial broadcasts has been to obtain funds to enable it to broadcast its educational, civic and cultural programs without charge. Its aim has been only to make station WEVD self-supporting, and up to the end of 1940 the expenses of operation have exceeded receipts by some $37,000.

Thus in said case, the commercial activity of the organization was wholly incidental to its *primary* purpose; and therefore did not preclude the exemption.

affirming a Memorandum Opinion of this Court; and *Club Gaona, Inc.* v. *United States*, 167 F. Supp. 741 (S.D. Cal. 1958).

In summary, we are here compelled to reach the conclusions: That the present petitioner's activities in operating the resort at Tamiment were so primary, important, and substantial as to overshadow all its other activities; that these resort functions and activities did not in themselves, as we have hereinbefore decided, constitute the "promotion of social welfare" within the meaning of the statute; and therefore, that petitioner has failed to meet the test of having "operated exclusively" for social welfare.

Whether or not exemption from taxation should be allowed to any particular type of organization is solely a matter of congressional grace or policy. Section 501(c)(4) here involved, sets forth specific tests which must *all* be met as a prerequisite to obtaining exemption thereunder. One of these tests is that the organization claiming exemption must be "operated exclusively" for the public purpose therein stated. And, as the Supreme Court stated with respect to a similar statute in the above-cited *Better Business Bureau* case, the word *exclusively* "plainly means that the presence of a single * * * [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes." In the instant case we are convinced that, for the reasons stated above, the "operated exclusively" test of section 501(c)(4) has not been met.

We decide the issue in favor of the respondent. And, since the amount of the determined deficiency is not in dispute, it is approved.

Reviewed by the Court.

*Decision will be entered for the respondent.*