BEN KLEIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Klein v. Commissioner
Docket No. 14853-80.
United States Tax Court
T.C. Memo 1984-392; 1984 Tax Ct. Memo LEXIS 278; 48 T.C.M. (CCH) 651; T.C.M. (RIA) 84392; July 30, 1984. *278 Petitioner was convicted of filing false tax returns for the years 1966 through 1970. Held, petitioner is collaterally estopped from denying fraud for those years notwithstanding newly discovered evidence and claims of constitutional violations in the criminal case, and additions to tax under sec. 6653(b), I.R.C., 1954, are sustained for those years. Respondent failed, however, to prove fraud by clear and convincing evidence for the years 1962 through 1965. Different results for different years were reconcilable. Petitioner's claim of incompetence to form the requisite fraudulent intent is rejected. Rick Budd and Benjamin Spitzer, for the petitioner. Benjamin De Luna and William F. Garrow, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In a statutory notice of deficiency dated May 8, 1980, respondent determined deficiencies in and additions to petitioner's Federal income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b) [1]
1962
$11,627.29
$5,813.64
1963
8,154.23
9,738.20
1964
3,705.11
1,852.56
1965
8,764.78
9,622.59
1966
10,777.40
5,388.70
1967
7,801.18
3,900.59
1968
11,650.23
7,029.23
1969
9,346.60
5,017.80
1970
16,162.05
13,369,60
*280 Petitioner contends that (1) due to mental illness, he was not competent during the years in question to form a fraudulent intent to understate his income taxes; (2) his conviction of violating section 7201 for the years 1966 through 1970 cannot be the basis of collateral estoppel because of newly discovered evidence and alleged Fifth and Sixth Amendment violations relating to the criminal conviction; (3) respondent's net-worth analysis, which was the basis of the notice of deficiency, is defective. Respondent has conceded that certain adjustments to the net-worth computation must be made. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulations of facts are incorporated herein by this reference. Petitioner was a resident of Denver, Colorado, at the time he filed his petition herein. Petitioner was born on November 5, 1926, in Denver, Colorado. Petitioner's parents had separately fled European religious persecution, and they had met at the National Jewish Hospital in Denver, where they were patients seeking treatment for tuberculosis. His parents' background, their protective attitudes, his religious training, and his feelings of isolation had a pronounced *281 effect on petitioner's personal development. By the time petitioner was in high school, he began imagining that he heard religious figures speaking to him. He was obsessed by thoughts of death striking his parents and by worries over his schoolwork. In 1942, during petitioner's first year of high school, petitioner's mother attempted to commit suicide by drinking iodine. She was committed to the state mental institution in Pueblo, Colorado, but was subsequently released to the custody of her husband. Thereafter, and until her death in 1973, petitioner's mother refused to eat unless either petitioner or his father spoonfed her. Petitioner's father died within a few months of the death of him mother. In 1944, petitioner volunteered for the United States Navy. He continued to imagine that he heard well-known Jewish religious figures instructing him on how to conduct his daily life and to be obsessed with thoughts about the death of his parents. He was or perceived himself to be abused because of his religion. He was forced to eat pork contrary to the teachings of his religion; he was forcibly given "GI showers," i.e., with hard brushes, possibly because of his lack of personal *282 hygiene; he was given extra duty and denied certain privileges. During this time, he was notified by his father that his mother had again attempted suicide. After basic training, he was sent to storekeepers school. Because of continuing problems, including headaches, frequent sore throat, nervousness, insomnia, and anxiety, and reported hallucinations, he was sent to sickbay. Thereafter, he was reassigned to the Psychiatric Observation Center at Sampson, New York. In August 1945, he was discharged from the Navy for medical reasons. After his discharge from the Navy, petitioner returned to Denver and registered at the University of Denver. During 4 years of undergraduate study, he received the grades of A's and B's. On June 11, 1949, he graduated with a degree in political science and a minor in history. During this period of time, he continued to imagine that he heard voices. He was advised to seek psychiatric help, but he did not follow that advice. Prior to completing his undergraduate degree, petitioner entered the University of Denver College of Law. He received B's and C's in his law school courses and graduated in March 1951. He passed the Colorado bar examination *283 and commenced the practice of law in Denver in 1951. Petitioner's performance as a lawyer was erratic. He achieved some success in representing clients in negligence actions. When he secured cash settlements for such clients, he and the client would go to the bank and exchange the check received from the defendant for separate cashier's checks payable to the client and to petitioner. [2] Such clients were generally pleased with petitioner's service. On the other hand, petitioner frequently missed appointments and court dates. His clients would sometimes appear in court without him, complaining that they were unable to contact him. Petitioner's office was totally disorganized, with papers, including uncashed checks and money orders and cash, scattered everywhere. In September 1972, petitioner was suspended from the practice of law when the Colorado State Grievance Committee determined that he had submitted false documents to substantiate court costs. In 1956, petitioner was elected to the Colorado House of Representatives. He was repeatedly *284 reelected and served from 1957 to 1970. In 1970, he was elected to the Colorado State Senate for a 4-year term.Although he had some accomplishments during his years as a legislator, he also exhibited behavior that caused people to comment adversely. He missed many meetings. Throughout the years in issue, petitioner's behavior was at times unstable and bizarre. People observed him apparently talking to himself and being preoccupied with religious matters. He kept notes and diaries containing religious sayings and instructions to himself. He was personally unkempt. His car and his home were dirty and disorganized. During 1962, he commenced a dating relationship with Mary Ann Gill. Concerned about his behavior, she attempted to secure help for him by contacting Dr. Robert Cohen, a psychiatrist. She finally concluded that she would be unable to help petitioner and stopped seeing him. She next saw him again in 1967 and continued to see him occasionally until 1969. During that period she observed that his unusual behavior and personal habits had not improved since she had known him in 1962. Sometime during the 1960's, petitioner represented an accused murderer who was acquitted *285 after interposing an insanity defense. After the trial, petitioner spoke with the psychiatrist who had testified at the trial. Petitioner explained to the psychiatrist that he, like the accused murderer, had been hearing voices. The psychiatrist listened to petitioner for several hours and then advised him that he was ill and should not be practicing law. In about 1956, petitioner was introduced to Agnes Kitzmiller and her son Charles. The Kitzmillers believed that the Pope and other people were trying to kill them with "rays" and that they got relief from the rays when they sat in petitioner's office. From 1956 through 1960, Mrs. Kitzmiller gave petitioner thousands of dollars in cash and checks. Petitioner did not spend the money received from Mrs. Kitzmiller because several people who had previously dealt with the Kitzmillers had come under federal grand jury investigation concerning $25,000 that she had given them. Petitioner kept the money in safes so that he could return it if ever requested to do so. Mrs. Kitzmiller's husband died in 1960, and petitioner was scheduled to be the attorney for the estate. By this time, however, Mrs. Kitzmiller accused petitioner of *286 joining the conspiracy against her. Mr. Kitzmiller's estate paid petitioner $11,000 in 1960 and in 1961. Petitioner then believed that Mrs. Kitzmiller would not ask for return of the money, and he began spending it. In 1966, petitioner received $5,000 in trust for a client, James Redd. Repayment occurred after the years in issue. In 1966, petitioner's father began making large cash gifts to petitioner. Prior to 1966, petitioner's father had only given petitioner nominal gifts at holidays and birthdays. The first cash gift petitioner's father made in 1966 was in the amount of $2,000. In each year 1966 through 1970, petitioner's father gave him between $1,000 to $1,500 on his birthdays. Petitioner's father also started making additional cash gifts of between $900 and $6,000 four or five times each year. In 1969, petitioner's father gave him approximately $7,000 to be used for an investment. When the investment was not made, petitioner opened a savings account as trustee for his father, adding to the account some funds of petitioner's. Throughout the years at issue, petitioner had investments in real estate, stocks, and partnerships and other personal property. Some of *287 the investment assets were held in the name of a partner or business associate. Petitioner did not take an active management role in any of these investments. In June 1971, the Intelligence Division of the Internal Revenue Service began an investigation of petitioner's tax liabilities for the years 1968, 1969, and 1970. The investigation resulted from information received from the Bureau of Narcotics and Dangerous Drugs, which had received a tip from an incarcerated person. Internal Revenue Service Special Agent Paul Grimes first contacted petitioner by telephone in September 1971. Petitioner consulted Marvin Smith, who had prepared tax returns for certain entities in which petitioner had an interest. In June 1971, petitioner had asked Smith to prepare petitioner's then-unfiled individual income tax returns for 1969 and 1970. Smith advised petitioner not to talk to Grimes but to retain an attorney. The attorney retained by petitioner then contacted Grimes. Between September 1971 and October 1972, Grimes conducted his investigation, which was expanded to include the years 1962 to 1970. Because the criminal period of limitations had expired for years prior to 1966, Grimes *288 did not thoroughly investigate those years.He did, however, record certain information material to those years for use in preparation of net-worth schedules. During the investigation, Grimes was provided with certain leads by petitioner and his counsel. Other leads were provided to Government attorneys prior to the criminal trial discussed below and after Grimes' report was completed. On December 12, 1972, petitioner consulted Dr. Robert Cohen. He was treated by Dr. Cohen from December to March 1973, during which time he was given electroshock treatments. On April 6, 1973, petitioner was readmitted to the hospital because he was suicidal. He remained there until May 7, 1973. On April 6, 1973, a Grand Jury in Denver returned an indictment in the United States District Court for the District of Colorado charging petitioner with five counts of income tax evasion, section 7201, for the years 1966 through 1970. Petitioner's defense counsel tendered the defense of mental incapacity and also asserted that petitioner was not competent to stand trial. The District Court found petitioner competent to stand trial after a hearing in which a court-appointed psychiatrist, Dr. Frederick *289 Miller, testified that petitioner did not appear motivated to work on his defense and was not cooperating with his attorneys even though he had the capacity to do so. The criminal case commenced on September 17, 1973, and continued for 9 days of trial. Psychiatric and lay witnesses testified as to petitioner's mental condition prior to and during the years of the indictment and up to the time of trial. All of the psychiatric witnesses agreed that petitioner had serious mental disturbances. They disagreed, however, as to whether he was paranoid or schizophrenic, whether he had the capacity to form fraudulent intent with respect to his tax liabilities during the years in issue, and whether he was malingering as of the time of trial. Petitioner, through his counsel at the criminal trial, conceded that there were understatements of income during the years 1966 through 1970 but blamed those understatements on petitioner's lack of organization, errors by the return preparers, and other nonfraudulent circumstances. On September 29, 1973, the jury reported its verdict that petitioner was guilty of tax evasion. Petitioner's conviction was affirmed by the Court of Appeals for the Tenth *290 Circuit on December 13, 1979. Subsequent attempts to have the matter reopened and the conviction overturned, including attempts made shortly prior to trial of this proceeding, have been unsuccessful. At the trial of this proceeding, October 31 through November 2, 1983, petitioner presented two witnesses whose identities and roles were unknown to petitioner's counsel during the criminal case.The first was Mary Ann Gill, whose observations of petitioner are discussed above. The second was James Hyland, who had observed petitioner's behavior at the Psychiatric Observation Center at Sampson, New York, in 1945 and again during the 1960's, when Hyland was chief probation officer for the United States District Court in Denver. These witnesses provided additional, but cumulative, testimony as to petitioner's condition and behavior prior to and during the years in issue. Petitioner's tax returns for the years in issue were filed as follows: Taxable Income
Income Tax
Year
Date Filed
Reported
Reported
1962
5/2/63
$8,779
$2,450
1963
4/14/65
26,646
11,322
1964
5/17/65
23,131
8,049
1965
5/11/66
28,676
10,480
1966
4/15/67
12,268
3,280
1967
4/15/68
7,439
1,854
1968
7/24/70
8,521
2,408
1969
8/24/71
3,665
689
1970
8/24/71
2,004
319
*291 During trial of this case, respondent adjusted his determination of underreported taxable income and income tax to take account of certain assets omitted from the schedule used in preparation of the statutory notice. Respondent's revised calculations are as follows: Taxable Income
Income Tax
as Revised
as Revised
Taxable Income
as a Percentage of
Income Tax
as a Percentage of
Year
as Revised
Taxable Income
as Revised
Income Tax Reported
Reported
1962
$19,825
226%
$7,167
292%
1963
39,424
148%
19,343
171%
1964
29,447
127%
11,530
143%
1965
46,845
163%
20,375
194%
1966
30,375
248%
11,349
346%
1967
25,519
343%
8,790
474%
1968
30,228
355%
12,116
503%
1969
17,037
465%
5,242
761%
1970
42,778
2,135%
18,738
5,874%
ULTIMATE FINDINGS OF FACT Respondent's reconstruction of petitioner's income for the years in issue by the net-worth method contained many errors, and certain of those errors affected the opening balance as of January 1, 1962. The errors were attributable in large part to petitioner's failure to maintain adequate records or to provide definitive information *292 as to nontaxable sources of income and assets. Other errors, however, with respect to the earlier years, arose from the failure to pursue leads provided by petitioner's counsel as to nontaxable sources of income during the years 1962 through 1965 because those years were not the subject of the criminal case. Such leads included reference to cash received during the years 1956 through 1960 from Agnes Kitzmiller. Respondent's net-worth analysis used in preparing the notice of deficiency also omitted certain assets owned by petitioner. During respondent's investigation of petitioner's tax liability and as of the time that he was examined by the psychiatrists and psychologists who testified during the criminal case, petitioner's mental condition was adversely affected by the serious illness and ultimate death of each of his parents, by the disciplinary proceedings leading to his suspension as a member of the Colorado bar, and by the criminal investigation, indictment, and trial. His mental condition during the years in issue was not as severe as it was during his Navy experience or during 1973, and, during the years 1962 through 1970, it did not so incapacitate him that he could not *293 file correct income tax returns for those years. His mental condition, however, does provide a nonfraudulent explanation of his failure to keep adequate records or to provide complete and accurate information as to sources of apparent increases in his net worth. OPINION The foregoing findings of fact are a necessarily drastic condensation of 2,382 pages of the criminal case transcript, which has been incorporated into the record in this case by the stipulation, and 597 pages of transcript of this case, plus over 100 exhibits, some of which themselves consist of numerous pages. That evidence has been carefully reviewed, and the Court concludes that there is little dispute as to the operative facts. The Court accepts the testimony of petitioner and of the other witnesses that certain events occurred as unimpeached and provided in good faith. The primary factual issue, that is whether petitioner had the mental capacity during the years in issue to form the necessary fraudulent intent, is inevitably a matter of opinion. In that regard, we have concluded that the opinion that best reconciles all of the undisputed evidence as to petitioner's history before, during, and after the *294 years in issue is that, notwithstanding serious mental illness, petitioner did not lack the capacity to understand his legal obligations, to conform his conduct to the law, or to form the intent to defraud that is a prerequisite for the additions to tax under section 6653(b). During the years in issue, he was able to function as a lawyer and as a legislator and to employ professionals and provide them with access to the information necessary to a determination of his correct liability. The Court's conclusions in this regard, however, are not determinative of this case by reason of the resolution of the other, essentially legal, issues. We render an opinion on the issue of petitioner's capacity only because it is relevant to our reconciliation of the different results reached as to the years 1962 through 1965, on the one hand, and the years of the indictment, 1966 through 1970, on the other. Briefly, for the reasons set forth below, we conclude that respondent has not met his burden of proving fraud for the years 1962 through 1965 and that, therefore, any deficiency for those years is barred by the statute of limitations. As for the years 1966 through 1970, petitioner is collaterally *295 estopped from denying fraud, and the deficiencies are determined by adjusting respondent's net-worth analysis by amounts now conceded by respondent or proven by petitioner. Evidence of Fraud - 1962 through 1965
The 50-percent addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell,303 U.S. 391, 401 (1938).Respondent had the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *296 Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). "The Courts should not sustain findings of fraud upon circumstances which at the most create only suspicion." Davis v. Commissioner,184 F.2d 86, 87 (10th Cir. 1950). Respondent must prove fraud in each of the years involved. Drieborg v. Commissioner,225 F.2d 216, 220 (6th Cir. 1955). A pattern of consistent underreporting of income for a number of years, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud as to each of the years. *297 Holland v. United States,348 U.S. 121, 129 (1954); Estate of Mazzoni v. Commissioner,451 F.2d 197 (3d Cir. 1971); Agnellino v. Commissioner,302 F.2d 797 (3d Cir. 1962); Otsuki v. Commissioner,supra.
With respect to use of the net-worth method to reconstruct income, the Supreme Court in Holland v. United States,supra at 129, admonished: While we cannot say that these [therein discussed] pitfalls inherent in the net worth method foreclose its use, they do require the exercise of great care and restraint. The complexity of the problem is such that it cannot be met merely by the application of general rules. * * * Trial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute. [Citations omitted.] These comments apply equally to this civil case. In this case, in addition to proving fraud in order to sustain the additions to tax under section 6653(b), respondent must prove fraud by clear and convincing evidence in order to overcome *298 the bar of the statute of limitations. Section 6501(a) and section 6501(c)(1); Asphalt Industries, Inc. v. Commissioner,384 F.2d 229, 232 (3rd Cir. 1967); Botwinik Brothers of Mass. Inc. v. Commissioner,39 T.C. 988, 996 (1963). Specifically, respondent must prove (1) an underpayment of tax and (2) fraudulent intent. Respondent's burden in cases such as this includes the necessity of overcoming inferences drawn from competent psychiatric testimony that suggests that false returns were the product of mental disease. Hollman v. Commissioner,38 T.C. 251, 260 (1962); Staudt v. Commissioner,216 F.2d 610 (4th Cir. 1954), affg. a Memorandum Opinion of this Court. Respondent cannot rely on petitioner's failure to overcome the normal presumption of correctness of the notice of deficiency as to any of the elements necessary to proving fraud in this case. See Otsuki v. Commissioner,supra at 106; Pigman v. Commissioner,31 T.C. 356, 370 (1958). Respondent cites six so-called "badges of fraud" for the years 1962 through 1965. See *299 Spies v. United States,317 U.S. 492, 499 (1943). First, respondent argues that there were "substantial understatements of taxable income and substantial underreportings of income taxes for the taxable years 1962 through 1970." Respondent's evidence on this point, however, consists of his net-worth analysis, which we have found to be defective. Respondent's agents failed to pursue leads provided by petitioner's counsel with respect to cash received from Mrs. Kitzmiller. Even though such leads may not have been relevant to the criminal case, they should have been pursued in preparing the notice of deficiency in this case or in preparing for trial in this case.See Holland v. United States,supra at 135-136. Respondent also omitted other assets, as found above. After adjusting the net-worth anaylsis for the omissions, which primarily affect beginning net worth and income thus determined for 1962, we conclude that, using respondent's figures, the alleged understatement of income for the years 1962 through 1965 is much less pronounced than that determined by respondent for later years. Considering the relatively small amounts involved for those *300 years and the inherent lack of precision of the net-worth analysis, we are not persuaded that a pattern of substantial underreporting has been established by clear and convincing evidence. Respondent's second and third alleged "badges of fraud" are petitioner's lack of books and records for the years 1962 through 1965 and incomplete bank records for the years 1965 through 1970. We conclude that these inadequacies have been explained by the psychiatric testimony as to petitioner's habits, lack of organization, and lack of motivation to keep accurate records. While such inadequacies are evidence of a high degree of negligence, we are not satisfied that in this case they constitute evidence of fraudulent intent. Respondent, as a fourth alleged "badge of fraud," characterizes as "concealment of his investments during 1964 and 1965," the fact that certain partnership assets were acquired in the name of a partner rather than in petitioner's name. The evidence, however, shows that the partner, and not petitioner, was the motivating force with respect to these investments and that title was taken in a manner consistent with common business practice. Fifth, respondent cites "petitioner's *301 lack of cooperation with the respondent's special agent." If the alleged lack of cooperation were incomplete or misleading statements made by petitioner during interviews by the special agent, we would understand this argument (but might reject it as explained by petitioner's mental condition and history of real or imagined persecution).We reject with the utmost emphasis, however, respondent's attempt to characterize as failure of cooperation and evidence of fraudulent intent the employment of an attorney (gratuitously characterized by respondent as "a prominent criminal tax attorney") by petitioner upon the advice of his return preparer, after he was contacted by a special agent of the Internal Revenue Service. We agree with petitioner's description that respondent's counsel has "concocted a new badge of fraud called reliance on the Sixth Amendment to the United States Constitution." We refuse to dignify this contention with further discussion of the factually inaccurate statements that accompany it in respondent's brief. Finally, respondent asks us to infer fraud for the years 1962 through 1965 on the basis of petitioner's conviction for the subsequent years 1966 through 1970. *302 Respondent has the burden of proving fraud in each year in issue, and he has failed to do so.The evidence for all of the years in issue suggests that the large understatements of income commenced in or about 1966, after (1) a pattern of reporting increasing amounts of income and taxes for the years 1962 through 1965 and (2) petitioner's payment of substantial amounts of taxes between April 1965 and May 1966 (including late payments for 1963). [3] Moreover, as discussed further below, the Government's use of the net-worth analysis in the criminal case was bolstered by evidence of specific underreporting of income, most of which was admitted by counsel for petitioner in that case. We do not consider petitioner's conviction on counts relating to the later years, on different facts, as evidence of fraud in the earlier years. Because respondent has not established fraud for the years 1962 through 1965, any assessment for those years is barred by the statute of limitations. *303 Collateral Estoppel by Conviction - 1966 through 1970
Petitioner recognizes the general rule that a conviction under section 7201 will collaterally estop a taxpayer from denying fraud for purposes of section 6653(b) an a civil tax case involving the same years. Amos v. Commissioner,43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965). Petitioner contends, however, that because of new facts and special circumstances in this case, we should not apply the general rule of collateral estoppel. It is, therefore, useful to set forth at some length the origin, purposes, and limitations of the doctrine set forth in Commissioner v. Sunnen,333 U.S. 591, 597-599 (1948), as follows: It is first necessary to understand something of the recognized meaning and scope of resjudicata, a doctrine judicial in origin. The general rule of resjudicata applies to repetitious suits involving the same cause of action. It rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations. The rule provides that when a court of competent jurisdiction has entered a final *304 judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." * * * But where the second action between the same parties is upon a different cause or demand, the principle of resjudicata is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined in the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, *305 he cannot later renew that duel.In this sense, resjudicata is usually and more accurately referred to as estoppel by judgment, or collateral estoppel. These same concepts are applicable in the federal income tax field. Income taxes are levied on an annual basis. Each year is the origin of a new liability and of a separate cause of action. Thus if a claim of liability or non-liability relating to a particular tax year is litigated, a judgment on the merits is resjudicata as to any subsequent proceeding involving the same claim and the same tax year. But if the later proceeding is concerned with a similar or unlike claim relating to a different tax year, the prior judgment acts as a collateral estoppel only as to those matters in the second proceeding which were actually presented and determined in the first suit. * * * But collateral estoppel is a doctrine capable of being applied so as to avoid an undue disparity in the impact of income tax liability. A taxpayer may secure a judicial determination of a particular tax matter, a matter which may recur without substantial variation for some years thereafter. But a subsequent modification of the significant *306 facts or a change or development in the controlling legal principles may make that determination obsolete or erroneous, at least for future purposes.If such a determination is then perpetuated each succeeding year as to the taxpayer involved in the original litigation, he is accorded a tax treatment different from that given to other taxpayers of the same class. As a result, there are inequalities in the administration of the revenue laws, discriminatory distinctions in tax liability, and a fertile basis for litigious confusion. Such consequences, however, are neither necessitated nor justified by the principle of collateral estoppel. That principle is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally.It is not meant to create vested rights in decisions that have become obsolete or erroneous with time, thereby causing inequities among taxpayers. [Citations omitted.] In Montana v. United States,440 U.S. 147, 153-155 (1979), cited by petitioner, the court reiterated the function of collateral estoppel in protecting parties from the expense and vexation of multiple *307 lawsuits, conserving judicial resources, and fostering reliance on judicial action by minimizing the possibility of inconsistent decisions. The Supreme Court also restated the three requirements for the application of collateral estoppel that petitioner relies on here, to wit, that the issues presented are in substance the same as those previously resolved, that the controlling facts or legal principles must not have changed significantly since the prior judgment, and that there are no special circumstances warranting an exception to the normal rules of preclusion. With respect to petitioner's claim that there has been a significant change in the facts, petitioner is referring only to new evidence recently discovered with respect to his mental condition; there has been no change in the underlying facts. Petitioner's position is based on the new evidence provided by James Hyland and Mary Ann Gill as to petitioner's mental condition when he was in the Navy and during the early 1960's, respectively, and to new testimony from psychiatrists who examined petitioner subsequent to his criminal conviction, one of whom was treating petitioner through the time of trial of this case. Petitioner *308 contends that his mental condition at the time of his criminal trial precluded his cooperating with his counsel and providing the names of Gill and Hyland as potential witnesses and that, therefore, the psychiatric evidence at the time of trial could not have taken into account the observations of those witnesses. Moreover, the treating psychiatrist, Dr. Robert Fairbairn, had spent much more time with petitioner than any of the other psychiatric witnesses. This evidence was not "unavailable" during the criminal trial, and it was merely cumulative with respect to the basic issue of petitioner's capacity to form a fraudulent intent. In any event, the evidence does not alter the controlling facts. See Dean v. Commissioner,56 T.C. 895 (1971); see also Fairmont Aluminum Co. v. Commissioner,22 T.C. 1377 (1954),ffd. 222 F.2d 622 (4th Cir. 1955). The District Court's finding that petitioner was competent to stand trial necessarily included a finding that petitioner could cooperate with his counsel in his defense. See 18 U.S.C. sec. 4244. Although the court-appointed psychiatrist, Dr. Miller, acknowledged that petitioner *309 was not cooperating, the failure to do so was attributed to lack of motivation rather than lack of capacity. Having reviewed all of the psychiatric evidence in relation to the earlier years, we reach the same conclusion. Collateral estoppel would be useless if it could be avoided merely by arguing about the degree of effort that a party put into prior litigation. Petitioner further argues that an exception to the rule of collateral estoppel should be applied here because of special circumstances.Petitioner contends that the Government's use of the net-worth method was tainted because the investigation originated with a tip from an incarcerated individual suggesting that petitioner was involved in drug dealing and that the Government believed that drug dealing was the source of increases in petitioner's net worth. Further, argues petitioner, the Government did not believe petitioner's contention that he had received nontaxable income, to wit, large cash gifts from his father, because of the special agent's belief that narcotics trafficking was a likely source. Finally, petitioner argues that failure to disclose the Government's belief and the originating tip to defense counsel *310 violated petitioner's right to due process under the Fifth Amendment and his right to assistance of counsel under the Sixth Amendment. In the context of the case as it developed, petitioner's argument is unpersuasive. As petitioner admits, during the entire criminal trial, the Government never suggested that illegal drug trafficking was a likely source of income. Other possible sources, to wit, petitioner's law practice and various investments, were established. Petitioner argues that his defense counsel in the criminal case might have cross-examined Government witnesses about their alleged belief in petitioner's involvement in drug trafficking in order to set up the straw man and then knock it down. This information, however, does not directly contradict any testimony given by the prosecution's witnesses. [4] The defense presented evidence that petitioner's father had made cash gifts to him during the years in issue and attempted to show that the law practice and investments could not account for the bulges in petitioner's net worth. *311 Respondent argues that, in any event, petitioner is pursuing an impermissible collateral attack on his conviction that has already been rejected by the District Court and the Court of Appeals, and that we cannot entertain such an attack. See Fontneau v. United States,654 F.2d 8 (1st Cir. 1981). Obviously we have no ability to rule on the validity of the criminal conviction. We do, however, have the power and the obligation to decide whether the doctrine of collateral estoppel should apply in this case. See Worcester v. Commissioner,370 F.2d 713 (1st Cir. 1966), affg. in part, vacating in part, and remanding a Memorandum Opinion of this Court. We believe that special circumstance preventing the application of the doctrine of collateral estoppel might arise if we found that application of the doctrine of collateral estoppel in this case created anomalous results by reason of the inconsistent conclusions reached with respect to the years 1962 through 1965, on the one hand, and 1966 through 1970, on the other, or if we were convinced that a substantial injustice would occur. See *312 Commissioner v. Sunnen,supra.In relation to our determination as to whether clear and convincing evidence of fraud has been presented for the earlier years, however, we have heard the evidence that petitioner tendered as to his intent during all of the years and have concluded that he did not lack the capacity to form fraudulent intent.Even with the adjustments discussed below, the net-worth schedule used by respondent in the criminal case and the specific evidence of omitted income, including petitioner's admissions, establish a pattern of underpayment of tax for the years 1966 through 1970. The differences in evidence presented by the Government with respect to the different years provide the basis for reconciliation of different results. Cases of this nature are almost always dependent upon circumstantial evidence, and the objective circumstances here, as to the years 1966 through 1970, provide no basis for declining to apply collateral estoppel. Adjustments to Income Determined by Respondent -- 1966 through 1970
We find petitioner's evidence persuasive that the following additional adjustments to income determined by respondent must be made: (1) *313 Gifts from Petitioner's Father.
Petitioner could only estimate the amount of gifts received from his father, and we can do no better. His testimony is unclear as to whether certain specific gifts described by him were or were not included as part of the annual pattern he describes. His testimony that large gifts were received, however, was corroborated by other witnesses who had seen petitioner's father in the possession of large amounts of cash, some of which was given to petitioner. Although respondent places substantial emphasis on the failure of the father to file gift tax returns, we do not find that fact persuasive. Moreover, we infer that petitioner's equivocation during the special agent's interview in 1972as to the amount of gifts given him by his father, in view of the history of petitioner's relationship with his parents, might well be attributed to fear of causing problems for his father, who had large cash accumulations and had not filed gift tax returns. We must resolve doubts against petitioner because the inexactitude is of his own making. See *314 Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Using our best judgment, we conclude that petitioner received $5,000 in nontaxable cash gifts from his father in each of the years 1966 through 1970. (2) Trustee Certificate of Deposit.
Respondent's net-worth schedule includes a savings account opened by petitioner as trustee in 1969. Respondent's argument that the account on the schedule is a separate "trustee" account from that opened with funds received from petitioner's father is not supported by the record. Petitioner's redetermined income for 1969 should therefore be reduced by the amount of $7,000. (3) $5,000 Received from Client James Redd.
Petitioner testified that, in approximately 1966, he received $5,000 from settlement of an accident case for James Redd. His testimony was corroborated by documents indicating a repayment, with interest, occurring in 1972. We accept petitioner's testimony and find that the income determined by respondent for 1966 should be reduced by $5,000 in relation to this item. Petitioner has not shown any other errors in respondent's determination for the years 1966 through 1970 and, as adjusted for the foregoing *315 items, that must otherwise be sustained. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. Unless otherwise indicated, any reference to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.↩
2. Respondent argues that use of cashier's checks is evidence of fraud. In this context, that argument is unpersuasive. See infra.↩
3. This analysis is consistent with the closing argument of the prosecutor in the criminal case, who argued to the jury that in the 13-month period from April 1965 through May 1966, petitioner paid $30,000 in taxes and that this was a "motive to start evading taxes in the next two or three years."↩
4. During trial of this proceeding, petitioner attempted to show that the psychiatrist who testified in the criminal trial had been "poisoned" by being told by prosecutors that petitioner was involved in drug dealing. Petitioner failed to elicit any evidence to support that allegation and has now withdrawn it.↩