T.C. Memo. 2015-158

UNITED STATES TAX COURT

DANIEL H. GEORGE, JR., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 758-13.                      Filed August 12, 2015.

John J.E. Markham, II, for petitioner.

Carina J. Campobasso and Molly H. Donohue, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined deficiencies in and penalties on

petitioner's Federal income tax as follows:

[*2]

| | | Penalties | |
| Year | Deficiency | Sec. 6651(f) | Sec. 6663 |
| --- | --- | --- | --- |
| 1995 | $199,088 | $149,316.00 | -- |
| 1996 | 188,065 | 141,048.75 | -- |
| 1997 | 86,214 | 64,660.50 | -- |
| 1998 | 180,137 | 135,102.75 | -- |
| 1999 | 323,534 | 242,650.50 | -- |
| 2000 | 507,598 | 380,698.50 | -- |
| 2001 | 358,272 | 268,704.00 | -- |
| 2002 | 322,984 | -- | $242,238 |

As alternatives to the section 6651(f) and section 6663 penalties, respondent determined additions to tax under section 6651(a) and a penalty under section 6662, respectively. After concessions, the issues remaining for decision are: (1) whether sums deposited by petitioner and related interest for the years in issue are tax exempt under section 501(a) and(c)(4); (2) whether petitioner is liable for a fraud penalty under section 6663 or, alternatively, for an accuracy-related penalty under section 6662; and (3) whether petitioner is liable for fraud penalties under section 6651(f) or, alternatively, for additions to tax under section 6651(a). Unless otherwise indicated, all section references are to the Internal Revenue Code

**[*3]** in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner resided in Massachusetts when he filed his petition.

Petitioner, a.k.a. Dan West, is a chemist who holds four chemistry-related U.S. patents. During the years in issue, petitioner used both the kitchen and basement of his home to conduct experiments and went to local public libraries to conduct research. During those years, petitioner's activities included providing research services to health supplement companies and manufacturing mineral, herbal, and chemical supplements, which he sold to them.

The health supplement companies, through their representatives such as Richard Breitbarth of Biophase Laboratories, Inc., would provide raw materials and other resources that petitioner needed for his work. The companies considered petitioner a vendor and were unaware of any charitable organization or purpose with respect to his goods and services.

Petitioner received payments in the form of cash or checks for his services, but he did not provide the health supplement companies with any receipts. Checks

[*4] for his services were made out to petitioner in his name or to "Dan West". Petitioner asked a company, which was paying $5,000 a month for his services, to increase its payment to $10,000 a month because he believed it to be doing financially better because of his products. With at least one customer, petitioner requested that payments of $10,000 or less be made in cash and that payments over $10,000 be made by check. That customer would send to him "significant" cash payments through Federal Express.

Petitioner's activities also included directly administering supplements to various individuals and groups that came to see him on the porch of his home. A small selection of these customers, who came to form a core group for petitioner, believed their "sole purpose" was to spread the word about his products. They did so by word of mouth in settings such as meetings at their homes or encounters with people on the street. The core group also assisted petitioner in conducting retreats held at petitioner's home and nearby facilities. The core group would first meet with someone before that person could be invited to a retreat, i.e., a person could not just show up.

The retreats were sometimes held bimonthly for approximately 8-24 participants and usually ran over a long weekend (but could last longer). The retreats offered exercise, spirituality, holistic meals, and lectures on health and

**[*5]** science. The focal point of the retreats, however, was petitioner's personal administration of his nutritional supplements to the participants.

Participants were charged from $300 to $1,000 to attend a retreat. Petitioner sometimes received payments in cash or by check from participants but, again, did not provide any receipts. Typically the core group, acting as staff, was not charged any retreat fees, and members were reimbursed for travel expenses from the moneys paid by nonstaff participants.

Petitioner did not maintain any books or records of his activities, and the only financial records available were those maintained by banks where he held accounts. Petitioner declined to open a commercial bank account on behalf of a charitable entity and instead used his personal bank accounts to deposit the earnings from his activities. During the eight years in issue, petitioner had control over at least 14 personal bank accounts at nine different banks under several different Social Security numbers. Of these accounts only two were opened by petitioner using his actual Social Security number. The remaining 12 accounts were opened by petitioner with some digits of his Social Security number transposed. Almost all the bank accounts had petitioner's mother, Nancy Burnham, listed as the beneficiary.

[*6]  The accounts were opened and closed as follows:

| Bank | Names on account | Correct SSN | Opening date | Closing date | Approx. duration |
|---|---|---|---|---|---|
| Rockport National | Petitioner | Yes | 9/5/1981 | Open as of 12/31/2002 | 21 yrs, 3 mos. + |
| Salem Five Cents | Petitioner or Burnham | Yes | 12/31/1994 | 7/7/1997 | 2 yrs., 6 mos. |
| Bank-Boston | Petitioner ATF Breitbarth | No | 7/14/1995 | 12/11/1996 | 1 yr., 4 mos. |
| East Cambridge | Petitioner TR Burnham | No | 11/22/1995 | 11/18/1996 | 11 mos. |
| First Federal I | Petitioner ITF Burnham | No | 5/17/1996 | 5/31/1996 | 15 days |
| Boston Safe Deposit | Petitioner ITF Burnham | No | 5/17/1996 | 6/7/1996 | 22 days |
| Citizens I | Petitioner trustee for Burnham | No | 11/8/1996 | 11/24/1997 | 1 yr. |
| First Federal II | Petitioner ITF Burnham | No | 12/9/1996 | 3/11/1998 | 1 yr., 3 mos. |
| Citizens II | Petitioner trustee for Burnham | No | 12/2/1997 | 11/25/1998 | 11 mos. |

| [*7] First Federal III | Petitioner ITF Burnham | No | 3/11/1998 | 12/15/1998 | 9 mos. |
|---|---|---|---|---|---|
| Citizens III | Petitioner trustee for Burnham | No | 11/25/1998 | 12/3/1999 | 1 yr. |
| First Federal IV | Petitioner ITF Burnham | No | 12/15/1998 | 12/17/1999 | 1 yr. |
| Mt. Washington | Petitioner ITF Burnham | No | 12/3/1999 | Open as of 12/31/2002 | 3 yrs. + |
| Capital Crossing | Petitioner ITF Burnham | No | 12/15/1999 | Open as of 12/31/2002 | 3 yrs. + |

The funds petitioner received for his goods and services were deposited into these bank accounts. The deposits, and interest accruing therefrom, were as follows:

| Year | Total deposited | Interest |
|---|---|---|
| 1995 | $496,050 | $11,352 |
| 1996 | 436,310 | 71,577 |
| 1997 | 163,675 | 107,265 |
| 1998 | 385,203 | 126,928 |
| 1999 | 638,888 | 184,502 |

[*8] | 2000 | 1,000,050 | 261,207
2001 | 549,371 | 372,032
2002 | 507,155 | 337,053

Petitioner did not use these deposited funds for his personal expenses but used Social Security disability payments to support himself.

Petitioner did not file Federal income tax returns for 1995 through 2001. The Internal Revenue Service (IRS) sent an agent to investigate petitioner. The agent went to petitioner's home to meet with him, but petitioner did not want to be interviewed. Several weeks later, around December 31, 2002, the agent was able to conduct an interview with petitioner over the telephone. During the interview, petitioner indicated that he had not filed a tax return since at least the 1970s.

Petitioner explained to the agent that he was looking to save $10 million through donations and when he reached that amount he would have the resources necessary to set up a foundation. He further explained that if he had to pay tax on the donations then he would not be able to fulfill his dream and would give all the money back to the people that donated it. He stated that while he did not maintain business records, he did keep a list of benefactors who provided him with donations. The agent asked for the list but petitioner did not want to provide it.

**[\*9]**  On April 3, 2003, the Government of the United States indicted petitioner on four counts of tax evasion for the tax years 1996 through 1999 in violation of section 7201.  A Federal District Court jury found petitioner guilty on all four counts of tax evasion on May 18, 2004.  In her Memorandum of Sentencing Hearing and Report of Statement of Reason, the District Court judge determined the tax loss to be "level 17 (more than $325,000)".

Petitioner moved for a new trial, which the District Court denied.  He then appealed the trial court decision.  On appeal, the Court of Appeals for the First Circuit affirmed the lower court's decision in United States v. George, 448 F.3d 96 (1st Cir. 2006).

On May 12, 2003, petitioner filed articles of organization with the Commonwealth of Massachusetts to incorporate Biogenesis Foundation, Inc. (Biogenesis).  The articles provided that Biogenesis had no members, that petitioner served as its sole director and all of its officers, and that its principal office address was the same as petitioner's personal address.  On May 14, 2003, Biogenesis officially incorporated.

On behalf of Biogenesis, petitioner submitted Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, to the IRS on or around May 22, 2003.  Petitioner reported that he was filing Form

**[*10]** 1023 within 15 months from the end of the month in which Biogenesis was created or formed. The Form 1023 listed "Daniel George" as all the officers and sole director of Biogenesis. It also reported that Biogenesis received gifts, grants, and contributions of $6,600,000 from May 3, 2003 to December 31, 2003, and was projected to receive a total of $10,100,000 by end of 2005.

A statement attached to Form 1023--regarding Biogenesis' activities and operational information--referred to Biogenesis as "the brainchild of Daniel David West, a self-taught nutritional biochemist" and clarified in a footnote that petitioner was in the process of changing his name legally to Daniel David West. The statement also expressed the "mission" of Biogenesis, as follows:

> After many years spent refining his technology while at the same time serving the public and raising necessary funds, Mr. West is now in a position to achieve his goals by establishing a foundation with the mission of:
>
> 1. Researching epidemiology and environmental health;
>
> 2. Developing and testing treatments based on cellular regeneration technology;
>
> 3. Educating the public in the maintenance of personal and environmental health and the prevention and treatment of disease; and
>
> 4. Providing health products and treatment to those in need, regardless of their financial status.

[*11] After additional requests for information and concerns about petitioner's being the sole director were addressed (petitioner added two directors on November 21, 2003, neither of whom was from the original core group), the IRS granted Biogenesis tax-exempt status under section 501(c)(3) on December 2, 2003.

Petitioner filed a 2002 Form 1040, U.S. Individual Income Tax Return, apparently on or about October 7, 2003, even though the return is dated November 9, 2007.  In that return he reported $28 of gross income and zero tax owed.

Biogenesis filed a 2003 Form 990, Return of Organization Exempt From Income Tax, dated November 10, 2004.  Revenue was reported as $321,000 from contributions and gifts and $312,724 from other investment income.  No income-producing activities were listed.  Expenses consisted of $246,705 of legal fees and $600 of travel.  The organization's primary exempt purpose was listed as "MEDICAL RESEARCH IN CELLULAR REGENERATION".

Biogenesis retroactively filed Forms 990, dated October 26, 2011, for its tax years 1996 through 2002.  Each of these Forms 990 listed the organization's primary exempt purpose as  "RESEARCH IN CELL REGENERATION".  The reported revenue for each tax year corresponded to each year's "total deposited" amount shown in the table supra.  The income was reported as "program service

[*12] revenue" and the related interest as "interest on savings and temporary cash investments". Each Form 990 showed zero expenses. The 1996 Form 990 reported fund balances at the beginning of the year as $507,402 (the same amount as the total of the 1995 "Total deposited" amount of $496,050 and the 1995 interest of $11,352 shown in the table supra).

OPINION

Petitioner testified that his longstanding goal is to amass $10 million and that, once it is achieved, he would then "hire a legal team, a nonprofit team, accountants, and do it right", i.e., form a charitable organization. This objective, he claimed, was his reason for running profit-motivated activities for the years in issue and for stockpiling his earnings in his personal bank accounts. Bank deposits, however, are prima facie evidence of income, Tokarski v. Commissioner, 87 T.C. 74, 77 (1986), and taxpayers are required to include in their gross income all income from whatever source derived unless otherwise excluded by law, sec. 61(a).

In his petition, petitioner argued that the deposited funds for the years in issue were not his income but were either: (1) gifts or contributions to his organization, or (2) program income of his charitable organization exempt from taxation under section 501(3) (presumably section 501(c)(3)), or (3) program

[*13] income of a social welfare organization exempt from taxation under section 501(4) (presumably section 501(c)(4)).  Through stipulation petitioner agreed to the total amounts of deposits made into his bank accounts for the years in issue, and on brief he asserted that those deposited funds were not donations but constituted earnings from the goods and services that he provided.  He also abandoned his argument that this income was exempt under section 501(c)(3).

Thus petitioner's only remaining argument regarding this issue is that the income is exempt from taxation under section 501(a) as program income of an organization described in section 501(c)(4), which provides:

> (A)  Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes.

> (B)  Subparagraph (A) shall not apply to an entity unless no part of the net earnings of such entity inures to the benefit of any private shareholder or individual.

Although petitioner did not file for section 501(c)(3) tax-exempt status until 2003, after he was indicted, he asserts that Biogenesis nevertheless existed during the years in issue and has always held the same charitable, tax-exempt purpose. He therefore argues that while all income from 2003 onward is tax exempt under

[*14] section 501(c)(3), any income earned before 2003, including the years in issue, is exempt from taxation under section 501(c)(4), which, he asserts, does not require formal filings.

Respondent first contends that petitioner is collaterally estopped from raising this issue for the years 1996 through 1999 because he raised the identical issue in his prior criminal appeal. The facts for all years, however, are relevant to our determinations of whether a section 501(c)(4) organization existed. Thus while unnecessary litigation would be minimized by precluding certain arguments on the basis of collateral estoppel, the possibility of inconsistent results between "estopped" years (1996-99) and the remaining years (1995, 2000, 2001, and 2002) could arise. See Klein v. Commissioner, T.C. Memo. 1984-392, 48 T.C.M. (CCH) 651, 660 (1984), aff'd, 880 F.2d 260 (10th Cir. 1989). We do not address respondent's argument that collateral estoppel applies to the exempt organization issue.

To qualify for a section 501(c)(4) exemption under the facts herein, there must have been: (1) a civic organization, (2) that is not organized for profit, and (3) that is operated exclusively for the promotion of social welfare. See People's Educ. Camp Soc'y, Inc. v. Commissioner, 331 F.2d 923, 929 (2d Cir. 1964), aff'g 39 T.C. 756 (1963); sec. 1.501(c)(4)-1(a), Income Tax Regs. These requirements

[*15] are stated in the conjunctive; thus failure to satisfy any one of them bars qualification under section 501(c)(4).  Cf. Columbia Park & Recreation Ass'n, Inc. v. Commissioner, 88 T.C. 1, 13 (1987) (determining that the requirements of section 501(c)(3) are stated in the conjunctive), aff'd without published opinion, 838 F.2d 465 (4th Cir. 1988).  Additionally, if any of an organization's net earnings inure to the benefit of an individual, then it does not qualify.  Sec. 501(c)(4)(B).  We first address whether there was an organization at all.

Petitioner failed to show any distinct existence of an organization before 2003.  During the years in issue, neither petitioner nor his core group maintained financial records, kept minutes, drafted organizing documents or bylaws, requested an employer identification number, or put in place any structures that would be expected from a continuing organization.  See generally United States v. George, 448 F.3d at 101 (making a similar observation in petitioner's criminal case).  When questioned about Biogenesis' existence during the years in issue, one core-group member testified that "it wasn't really an entity at that point that I knew of.  I mean, we were just a group of us trying to heal ourselves".  Even the start year of the alleged organization is unclear:  1990 according to the petition and 1989 according to petitioner's testimony at trial.

[*16] Petitioner argues that his then activities functioned as a social welfare organization and therefore were tax exempt under section 501(c)(4) because they qualified as a charitable organization pursuant to section 501(c)(3). See secs. 1.501(c)(3)-1(d)(2), 1.501(c)(4)-1(a)(2), Income Tax Regs. In our view, petitioner's activities were commercial and provided substantial business profits for his use. If, however, his activities were "charitable", petitioner would have been subject to organizational requirements mandated by Massachusetts law. Before a charity may engage in its charitable work or raise funds in Massachusetts, it must file copies of its agreement of association, constitution, and bylaws. Mass. Gen. Laws Ann. ch. 12, sec. 8E (West 1996) (as existed on Dec. 31, 1994). Once registered, the charity must submit annual filings. Id. sec. 8F. Petitioner failed to show that he had met or even considered these State organizational requirements.

Petitioner also failed to meet the filing requirements of section 6033, which requires a tax-exempt organization earning over $5,000 a year (including a section 501(c)(4) organization) to file an annual return, in this case Form 990. See sec. 6033(a)(1), (2)(A)(ii); sec. 1.6033-1(a)(2)(i), Income Tax Regs. An organization is to disclose on that return, inter alia, its gross income, receipts, and disbursements and is to keep related records. See sec. 6033(a), (f), (i). Form 990

[*17] is to be filed by the 15th day of the 5th month after the organization's annual accounting period ends.  Secs. 1.6033-1(b), 1.6033-2(e), Income Tax Regs.

Petitioner did not maintain records in order to disclose this information, he failed to file Form 990 for 1995, and he filed Forms 990 for the other years in issue egregiously late.  The 1996 Form 990 was filed on October 26, 2011.  Assuming a calendar year (because petitioner elected no other accounting period), that form was required to be filed by May 15, 1997, and thus was filed over 14 years late.  Petitioner's failure to undertake any organizational formalities gives rise to a negative inference against his current "retrospective" position.

The most apparent organizational flaw, however, is that before 2003 there was no separation between petitioner and his activities.  Petitioner was the sole researcher, analyst, producer, service provider, and scientist (and was later defined as the only director and officer).  No one in the core group besides petitioner could have made a going concern of the alleged organization's reported primary exempt purpose--research in cell regeneration--during the years in issue.  (Conspicuously, cell-regeneration research was never mentioned at trial by petitioner, the core-group witnesses, or anyone else.)

Even more compromising is that petitioner was the only "member" of his group with control over the alleged organization's funds held in his personal bank

[*18] accounts. No one else, including the alleged organization, could have used the funds for any purpose, charitable or otherwise. He amassed approximately $5.6 million within an eight-year period, none of which went toward any charitable use.

A civic organization has been construed as "a movement of the citizenry or of the community." Commissioner v. Lake Forest, Inc., 305 F.2d 814, 818 (4th Cir. 1962), rev'g and remanding 36 T.C. 510 (1961). While there may be no specific definition of "civic organization", it nevertheless "must be a community movement designed to accomplish community ends." Erie Endowment v. United States, 316 F.2d 151, 156 (3d Cir. 1963). Petitioner's activities were the dominion of a single person and not a movement of any community.

Ultimately, petitioner did not treat his activities for the years in issue as a separate entity. In an effort to avoid taxation, petitioner is belatedly trying to make an organization appear where none had existed. Because there was no organization for the years in issue, petitioner is not entitled to tax-exempt status, and the sums deposited in his bank accounts and related interest are taxable income to him.

**[*19]** <u>Fraud Penalties</u>

The fraud penalties of sections 6663(a) and 6651(f) are civil sanctions provided primarily as safeguards for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. See <u>Helvering v. Mitchell</u>, 303 U.S. 391, 401 (1938). Section 6651(f) applies where a taxpayer fraudulently fails to file a return, while section 6663(a) requires a return to have been filed in order to establish an underpayment of tax. See sec. 6664(b); <u>Clayton v. Commissioner</u>, 102 T.C. 632, 652 (1994); <u>Mohamed v. Commissioner</u>, T.C. Memo. 2013-255, at *19-*20. The Commissioner has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). We first consider the section 6663(a) penalty.

To sustain the 75% penalty provided by section 6663, the Commissioner has the burden of proving (1) an underpayment of tax and (2) that the underpayment was due to fraud. See, e.g., <u>May v. Commissioner</u>, 137 T.C. 147 (2011), <u>aff'd per order</u>, 2013 WL 1352477 (6th Cir. Feb. 19, 2013); <u>Sadler v. Commissioner</u>, 113 T.C. 99, 102 (1999); <u>Parks v. Commissioner</u>, 94 T.C. 654, 660-661 (1990). The latter burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or

[*20] otherwise prevent the collection of such taxes. DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).

Petitioner has conceded his receipt of gross income for each year, including 2002, in the amounts set forth in our findings, and he did not argue any entitlement to deduct expenses related to that income beyond those deductions respondent already permitted. Because his income for the years in issue has been determined to be taxable and because he reported and paid no tax in 2002 when he should have paid tax of $322,984, respondent's burden of proving the underpayment for 2002 has been met. See, e.g., Brooks v. Commissioner, 82 T.C. 413, 432-433 (1984), aff'd without published opinion, 772 F.2d 910 (9th Cir. 1985).

As to respondent's second burden, fraud may be proven by circumstantial evidence, and the taxpayer's entire course of conduct may establish the requisite fraudulent intent. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). In determining whether petitioner's underpayment was due to fraud, we apply long-recognized "badges of fraud" evolved from cases analyzing section 6663 or former section 6653(b)(1). See, e.g., Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

"Consistent failure to report substantial amounts of income over a number of years is, standing alone, highly persuasive evidence of fraudulent intent."

[*21] Temple v. Commissioner, T.C. Memo. 2000-337, slip op. at 16-27, aff'd, 62 Fed. Appx. 605 (6th Cir. 2003); see also Holland v. United States, 348 U.S. 121, 139 (1954) (determining that "evidence of a consistent pattern of underreporting large amounts of income" supports "an inference of willfulness"). Dealing in cash is also considered a badge of fraud because it is indicative of a taxpayer's attempt to avoid scrutiny of his finances. See Bradford v. Commissioner, 796 F.2d 303, 308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601. Other badges of fraud include (but are not limited to) inadequate records, implausible or inconsistent explanations of behavior, concealing assets, failure to cooperate with tax authorities, filing of false documents, lack of credibility, and failure to file tax returns. Id. at 307; Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), aff'g T.C. Memo. 1984-25; Niedringhaus v. Commissioner, 99 T.C. at 213 (determining that a taxpayer's failure to file returns was a part of his "deliberate attempt to conceal his correct tax liability and to frustrate its collection"); Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), aff'd, 748 F.2d 331 (6th Cir. 1984).

Badges of petitioner's fraudulent intent include his failure to report over $5.6 million of income and his dealings in cash. He also failed to maintain records of any nature, failed to file tax returns for 1995 through 2001, and filed a false

**[*22]** 2002 return that understated income. His failure to report income and to file returns adds to his other attempts to conceal income such as his use of the alias "Dan West" to which business checks were made payable, his constant shifting of bank accounts that were opened with false Social Security numbers, and his asking for cash payments on fees of $10,000 and under. See 31 U.S.C. sec. 5313(a) (1994) (requiring that financial institutions report currency transactions in excess of $10,000); 31 C.F.R. sec. 103.22 (1995) (same). He also failed to cooperate with tax authorities when he refused his initial interview and refused to turn over the list of "donors" that he purported to have.

Additionally, petitioner's testimony often lacked credibility, was inconsistent, and suggested fraud. His explanation about accidentally transposing his Social Security number on 12 of the 14 bank accounts he opened was strikingly implausible given that he deals daily in exacting numbers, formulas, and calculations as a chemist. If, as he alleged, these Social Security number mistakes are just some "innocent tendency" of his behavior (which we do not believe they are), then he should have written his Social Security number down when going to open accounts for funds that are apparently very important to him.

Petitioner also testified that the frequent transfers of funds to and among his various bank accounts were "not that big a deal" because "the organization's

[*23] money * * * was always held in no more than two accounts at a time" and "even though there were 14 accounts, if you divide by two, that's seven years of two accounts at a time".  At one period during the years in issue, however, he simultaneously held six active accounts.  Moreover 10 of his 14 accounts were open for less than 1½ years, five of those 10 were open for less than a year, and two of those five were open for less than a month.  We infer that petitioner's transfers to these numerous accounts were attempts to conceal income despite his unsupported claim that he was "interest-rate" shopping.

An example of petitioner's inconsistent testimony is his statement that "I'm not a chemist, but I have enough chemistry background to work with people who really are chemists", even though he had stipulated that he is a chemist holding four patents.  He also testified that he "pretty much" had records identifying everyone who had contributed money to him so that he could return the money if he did not reach his goal of amassing $10 million.  Within minutes of that testimony, however, he renounced his statement that he kept records of his contributors and instead stated that he would rely on checks and his memory to identify them.

In another example, regarding the possibility of his dipping into the deposited funds, petitioner testified that "over $300,000 of those canceled checks

[*24] was money contributed or given by my family, my parents, my father, my grandmother, my uncle. So, that's over $300,000 of my own money in the '90s going towards the house." Yet later he testified that his parents and grandmother were poor. He did not offer any explanation as to how his parents and grandmother could be poor yet contribute large amounts of money.

These inconsistencies and the other determined badges clearly and convincingly prove fraud. Once the Commissioner establishes that any portion of an underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud, except with respect to any portion of the underpayment that the taxpayer establishes, by a preponderance of the evidence, as not attributable to fraud. Sec. 6663(b). Petitioner did not establish that any of the underpayment was not attributable to fraud. The penalty under section 6663 is therefore sustained, and respondent's alternative theory under section 6662 does not need to be considered.

Section 6651(f) provides a penalty of 75% of the amount required to be shown as tax on unfiled returns if the failure to file the returns is fraudulent. The taxpayer first must have been required to file a return and then failed to properly file it by its due date. See secs. 6012(a), 6651(a)(1), (b)(1). However, if a taxpayer can show that such failure is due to reasonable cause and not due to

[*25] willful neglect, then the section 6651(f) penalty will not be imposed. See

sec. 6651(a)(1). The standard for proving fraud under section 6651(f) considers

the same elements as the standard for proving fraud under section 6663(a) and its

predecessor section 6653(b), including badges of fraud. Clayton v. Commissioner,

102 T.C. at 653.

Collateral estoppel precludes relitigation of any issue of fact or law that was

actually litigated and necessarily determined by a valid and final judgment. See

Montana v. United States, 440 U.S. 147, 153 (1979); Brotman v. Commissioner,

105 T.C. 141, 147 (1995). We are satisfied that the decision in United States v.

George, 448 F.3d 96, was final and that petitioner failed to timely take effective

initiatives necessary for review of a Federal Court of Appeals decision. See Sup.

Ct. R. 13.1, 13.3; Fed. R. App. P. 35(c), 40(a)(1).

For 1996 through 1999, respondent relies on collateral estoppel and

petitioner's conviction under section 7201 with respect to the section 6651(f)

penalties. The law is well established that a conviction for criminal tax evasion

under section 7201 after a trial on the merits collaterally estops a taxpayer from

denying fraudulent intent under section 6663(a) or its predecessor section 6653(b)

for the same year. See DiLeo v. Commissioner, 96 T.C. at 885; see also Boettner

v. Commissioner, T.C. Memo. 1998-359, slip op. at 9-10 (pointing out that the

[*26] elements of criminal tax evasion under section 7201 are virtually identical to the elements of the civil fraud penalty under former section 6653(b)). Similarly, a conviction under section 7201 based upon failure to file a return will constitute collateral estoppel for the fraudulent failure to file penalty under section 6651(f). See Madge v. Commissioner, T.C. Memo. 2000-370, slip op. at 8-9, aff'd, 23 Fed. Appx. 604 (8th Cir. 2001).

Petitioner's convictions under section 7201 were based upon failure to file returns for 1996 through 1999--an issue heard at the criminal trial and that received a final judgment by the Court of Appeals for the First Circuit. Therefore, petitioner's convictions of criminal tax evasion under section 7201 for taxable years 1996 through 1999 collaterally estop him from denying that his failure to file returns for those years was due to fraud.

Regarding the remaining years for which collateral estoppel does not apply --1995, 2000, and 2001--we must decide whether petitioner was required to file returns and, if so, whether his failure to do so was accompanied by an intent sufficient to sustain the section 6651(f) penalty. Proof of gross receipts in the amounts shown by the bank deposits in this case is sufficient to show that petitioner had an obligation to file returns. See secs. 1, 6011, 6012. Petitioner failed to file returns for those years, and he did not show that his failure was due to

[*27] reasonable cause.  As the same badges of fraud that applied to the section 6663 analysis, <u>supra</u>, equally apply here, respondent's burden of proof of fraudulent intent has also been satisfied.

Consequently, the penalties under section 6651(f) for tax years 1995 through 2001 are sustained.  Because of this result, we need not consider respondent's alternative argument under section 6651(a).

In reaching our decision, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.